662 So.2d 509 (1995)
Masaichi HATTORI and Mieko Hattori
v.
Rodney PEAIRS, Bonnie Peairs and Louisiana Farm Bureau Mutual Insurance Company.
No. 95 CA 0144.
Court of Appeal of Louisiana, First Circuit.
October 6, 1995.
Writ Denied January 12, 1996.
*511 Charles Moore, Baton Rouge, for plaintiffs-appellees Masaichi Hattori and Mieko Hattori.
John Hainkel, Jr. and Arthur H. Andrews, Baton Rouge, for defendants-appellants Rodney and Bonnie Peairs.
Before LOTTINGER, C.J. and GONZALES and FITZSIMMONS, JJ.
LOTTINGER, Chief Judge.
This is a wrongful death and survival action filed by the parents of a 16-year old Japanese exchange student who was shot and killed by a homeowner. From a judgment in favor of the parents, the homeowner has appealed.

FACTS
In the fall of 1992, Yoshihiro Hattori (Yoshi) was a foreign exchange student from Nagoya, Japan living with the Richard Haymaker family at their home in Baton Rouge. Yoshi had come to the United States in August, and attended McKinley High School with the Haymaker's son, Webb. Both boys were nearly seventeen years of age and members of the senior class at McKinley.
A few weeks prior to the incident in question, the boys learned through an acquaintance, that another Japanese exchange student was living in the Baton Rouge area. She and Yoshi later spoke over the telephone, and the boys were subsequently invited to a Halloween costume party to be held for area exchange students at the home of the girl's host parents, Frank and Connie Pitre. On the evening of the party, Saturday, October 17, 1992, Webb's father allowed him to drive the family's car and provided him with directions to the Pitre home which was located in Central, an unincorporated community north of Baton Rouge.
Not being familiar with the Central area, Webb experienced some difficulty in finding the Pitre home which was situated at 10131 East Brookside. When Webb and Yoshi finally found East Brookside, Webb proceeded slowly down the street whereupon he observed various Halloween decorations at the third house on the right. Because the house bore a similar number, 10311 East Brookside, and had three cars parked in the driveway, the boys thought they had found the party. Having driven past the house, Webb turned the car around, and returned to park in front of the house.
As this was to have been a costume party, the boys were dressed up. Because Webb wore a soft cervical collar as a result of an earlier diving accident, his costume was that of an accident victim. Dressed in shorts and tennis shoes, Webb had a bandage around his head, a hand splint and an ace bandage around his knee. He wore no makeup or fake blood. Yoshi loved to dance and had decided to go as John Travolta's character from the movie "Saturday Night Fever". He rented a white tuxedo jacket, black pants and a ruffled white shirt of which he had unbuttoned the top three buttons. He also carried a camera. Neither boy wore a mask.
At approximately 8:15 P.M., the boys walked up the driveway, and rang the front doorbell.[1] No one answered the front door; however, the boys heard the clinking of window blinds emanating from the rear of the carport area to the left of where they stood. Webb, followed by Yoshi to his left, proceeded around the corner, under the carport, toward the carport door. As the boys turned the corner, Webb observed a small boy, approximately eight or nine years of age, peering *512 through the blinds of the carport door. A moment later, the door was opened by a woman wearing a bathrobe and glasses. As Webb attempted to speak to the woman, she slammed the door.
At this point, the boys turned around and walked down the driveway towards the sidewalk. Webb was fairly certain they had stopped at the wrong house, and attempted to communicate this fact to Yoshi. As they stood on the sidewalk near a streetlamp, the carport door opened again, and Webb observed a man standing in the doorway with a large handgun. At that point, Yoshi moved towards the house exclaiming enthusiastically, "We're here for the party!"
Webb, immediately grasping the seriousness of the situation, pleaded with his friend to come back; however, Yoshi, who was not wearing his contact lenses that evening,[2] continued towards the man smiling and explaining several times that he had come for the party. As Yoshi reached the carport, Webb heard the man in the doorway yell, "Freeze"; however, Yoshi continued to move towards the man. From Webb's vantage point, Yoshi was adjacent to the rear-view mirror of the Toyota station wagon parked on the right of the double carport, when the man in the doorway fired. The bullet struck Yoshi in the chest, causing him to fall to the ground on his back, with his head about a foot from the carport door.
At this point, Webb ran to the house next door, and screamed for the residents inside to call 911. The homeowner, Stan Lucky, answered the door and advised that his wife was calling the emergency number at that moment. Mr. Lucky then returned with Webb to the house next door, the home of Rodney and Bonnie Peairs, to render aid to Yoshi. Mr. Lucky elevated Yoshi's feet and instructed Webb to apply pressure to the wound in Yoshi's chest. The two labored until relieved by personnel from the Central Volunteer Fire Department who administered treatment while sheriff's deputies secured the scene. E.M.S. technicians arrived on the scene a short while later at 8:39 P.M. Sometime between 8:48 and 8:49 P.M., while en route to the hospital, Yoshi stopped breathing.
The homeowners, Rodney and Bonnie Peairs, testified that upon hearing the doorbell that evening, Rodney sent his stepson to answer the carport door. Not wanting her son to answer the door after dark, Bonnie Peairs stopped him and answered the door herself. Upon opening the door, she observed a person in bandages standing near a pillar of the porch at the end of the carport. A moment later, she observed an oriental person taller than she, with a small build, come quickly around the corner toward the door. Startled, Bonnie slammed the door, locked it, and yelled for her husband to, "Get the gun."[3]
Stating that he had never seen his wife so frightened, Rodney Peairs ran to the master bedroom, followed by Bonnie and their three children. There he retrieved the .44 magnum Smith & Wesson revolver equipped with a scope which he kept loaded in a suitcase situated on the top shelf of his closet. Now armed, Rodney raced to the carport door and peered through the blinds. Not seeing anything, and without seeking an explanation for his wife's startled behavior, Rodney flung open the carport door.
With Bonnie behind him to his right, Rodney positioned himself in the doorway. After observing movement at the rear of the Dodge vehicle parked in the driveway behind his pick-up truck, Rodney, moments later, was confronted by a figure to the rear of the Toyota station wagon which was parked on the right side of the carport. In the carport light, Rodney was able to discern an approaching oriental male approximately 5'7" in height wearing a white jacket who appeared to be laughing and carrying an object in his left hand. Raising his weapon with both *513 hands, Rodney shouted for the individual to "Freeze"; however, the stranger continued towards him uttering something unintelligible.
Several seconds later, Yoshi came alongside the right passenger mirror of the Toyota station wagon, Rodney, from the doorway of his home, fired his weapon striking Yoshi in the chest. Rodney immediately closed the door and locked it, instructing his wife to call 911. The family then proceeded to close open windows throughout the house and gathered around the kitchen table blocking out the plaintive cries emanating from the carport and the flashing lights of emergency vehicles.

ACTION OF THE TRIAL COURT
The shooting attracted national, as well as international attention. Following a four-day trial on September 12-15, 1994, the trial judge rendered judgment in favor of Yoshi's parents, Masaichi and Mieko Hattori (the Hattoris) finding Rodney Peairs to be solidarily liable with his homeowner's insurer, Louisiana Farm Bureau Mutual Insurance Company (Farm Bureau), in the amount of $653,077.85 together with legal interest and costs. Farm Bureau's liability was subject to the $100,000.00 coverage limitations of its policy.
Farm Bureau subsequently tendered its policy limits plus interest; Rodney Peairs has appealed.

ASSIGNMENTS OF ERROR
On appeal, Rodney Peairs contends that the trial court erred in:
(1) failing to admit the expert testimony of Dr. Wade Schindler in violation of Louisiana Code of Evidence Article 704;
(2) its determination that Rodney Peairs was not justified in his actions;
(3) in determining that Rodney Peairs committed an intentional tort;
(4) failing to apportion fault; and lastly,
(5) that the damages awarded to the Hattoris for the wrongful death of their son were excessive given there was no evidence of an unusually close relationship between Yoshi and his parents, and the amount given for the survivorship action was excessive in light of the length of time Yoshi was conscious after being shot.

I.
In his first assignment of error, Rodney Peairs asserts that the trial court erred in failing to admit the testimony of Dr. Wade Schindler, an expert in the use of deadly force. Dr. Schindler is a former law enforcement officer with a doctorate in criminal justice. For the past seventeen years, he has served as an adjunct professor of criminal justice at Tulane University and is the owner of a firearms training firm in New Orleans. He stated that he has previously given testimony in court as an expert in this field.
Because Dr. Schindler's opinions were based primarily on Rodney Peairs' version of the shooting as set forth in his deposition, plaintiffs objected on the grounds that it was unlikely that such testimony would be helpful to the trial judge in determining whether the actions of Mr. Peairs were reasonable. Plaintiffs further expressed doubt as to the existence of such a field of expertise.
In sustaining the objection, the court noted that because Dr. Schindler's testimony was offered for the purpose of assisting the court in its determination of whether the actions of Rodney Peairs were reasonable or not, the court concluded that such testimony was not needed.
We find no error with this determination. While counsel for Rodney Peairs cites Article 704[4] in brief, the general rule regarding the admissibility of expert testimony is found under Article 702 of the Louisiana Code of Evidence which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine *514 a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
La.Code of Evid. art. 702 (emphasis supplied).
Comment (c) under La.Code of Evid. art. 702 explains, "[u]nder this Article whether expert testimony is admissible turns upon whether it would assist the trier of fact to understand the evidence or to determine a fact in issue. Rather than preclude expert testimony if the matter in issue is within the knowledge of ordinary citizens, as was traditionally done under the prior law, this Article permits the expert to testify as to such matters if the court concludes that his testimony would be helpful to the trier of fact." (Citations omitted, emphasis supplied).
Comment (f) of the same article further notes that, "[e]xpert testimony, as generally with other evidence, is subject to the balancing test of Article 403. That proffered testimony is as to an ultimate issue in the case should be taken into account in determining whether it is, on balance, helpful or unduly prejudicial."[5]
The decision of whether to accept a witness as an expert in a trial is one left to the "much discretion" of the trial court, and the decision reached by the trial judge will not be disturbed on appeal unless it is clearly erroneous and involves a misunderstanding of law. Pino v. Gauthier, 633 So.2d 638, 650 (La.App. 1st Cir.1993), writs denied, 94-0243, 94-0260 (La. 3/18/94); 634 So.2d 858, 859; James v. State Farm Mutual Automobile Insurance Company, 597 So.2d 555, 560 (La.App. 1st Cir.1992). See also, La.Code of Evid. art. 702, comment (d).
In light of the fact that Dr. Schindler's opinions were based almost exclusively on Rodney Peairs's account of the shooting as set forth in his pre-trial deposition, we cannot say that such testimony would be helpful to the trier of fact in reaching an objective determination of whether Mr. Peairs' actions that evening were reasonable. The court concluded that testimony on this point was not needed. This assignment of error is without merit.

II.
The second assignment of error raised by Rodney Peairs is that the trial court was manifestly erroneous in determining that the shooting was not justified under the circumstances presented by this case. With regard to this issue, the trial judge found:
The law in Louisiana is that the standard in determining when a homicide is justified is found in La.R.S. 14:20. This is a criminal statute, but it is applicable to civil cases. The jurisprudence in Louisiana is well-settled that resort to the use of a dangerous weapon to repel an attack is not justified except in exceptional cases where the actor's fear of danger is not only genuine but is founded upon facts that would likely produce similar emotions in men of reasonable prudence.
There was absolutely no need to resort to the use of a dangerous weapon to repel an attack, as, in fact there would have been no fear of an attack if Rodney had summoned help or simply stayed within his home. Rodney Peairs' statement, "I was scared to death." [sic] We have no explanation why. No other reason than he heard his wife slam a door and say, "Get the gun."
The court believes very sincerely that a reasonable person would have responded with "Why do I need [sic] gun? What did you see, Bonnie?" Further, Rodney Peairs saw Yoshi at the back of the Toyota. He had sufficient time to shut the door, which Bonnie had done earlier. The court inquired as to why he did not shut the door. The excuse, well, the second time the door was open wider. So what? We know that when Rodney Peairs first saw Yoshi, he was further away than when *515 Bonnie had seen him, and she was able to shut the door.
Self defense, is not acceptable. There was no justification whatsoever that a killing was necessary for Rodney Peairs to save himself and/or to protect his family.
After a thorough review of the record, we must agree with the trial court. In brief, Rodney Peairs similarly relies upon La.R.S. 14:20[6] and asserts that at the time he shot Yoshi he reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that the use of deadly force was necessary to save himself and his family. Rodney Peairs also cites Duplechain v. Turner, 444 So.2d 1322, 1326 (La.App. 4th Cir.), writ denied, 448 So.2d 114 (La.1984), and a number of other cases for the proposition that the danger itself need not be real, if the actor reasonably believes that the threat of great bodily harm or death is imminent. Upon review of the cases cited by Rodney Peairs, we find same to be inapposite as the intruders were either armed or engaged in surreptitious activity on the defendant's property.
While we do not doubt that Rodney Peairs' fear of impending bodily harm was genuine, we nevertheless find nothing within the record to support his assertion that such fear was reasonable. Prior to the shooting, Yoshi and Webb had announced their presence by ringing the doorbell of the Peairs' home. Testifying that he believed Yoshi to be armed, Rodney Peairs conceded that he did not see a gun, a knife, a stick, or a club only an object which he later ascertained to be a camera. In the well-lit carport, Rodney Peairs stated that he observed an oriental person proceeding towards him and that he appeared to be laughing. We have no idea why Yoshi failed to heed Rodney Peairs' order to "Freeze," or grasp the danger posed by the gun, but can only speculate that the answer stems from cultural differences and an unfamiliarity with American slang. Under the circumstances of this case, we cannot say that it was either reasonable or necessary for Rodney Peairs to resort to the use of deadly force in order to protect himself and his family. This assignment of error is without merit.

III.
The next assignment of error raised by Rodney Peairs is that the trial court was manifestly erroneous in its determination that the shooting of Yoshi was an intentional act. In support of this assignment, Rodney Peairs cites Bazley v. Tortorich, 397 So.2d 475 (La.1981) for the proposition that an act is intentional "only where the actor entertained a desire to bring about the consequences that followed or where the actor believed that the result was substantially certain to follow." Rodney Peairs claims that while he intended to prevent an intruder from injuring himself or his family, he did not intend to kill a sixteen-year-old exchange student, and relying on Bazley, contends that his shooting of Yoshi does not constitute an intentional tort. We believe Rodney Peairs *516 has misconstrued the holding of Bazley, and therefore his reliance thereon is misplaced.
It is clear from the testimony elicited at trial that Rodney Peairs intended to shoot the individual who was proceeding under the carport towards him. At the time he fired the .44 magnum revolver, Rodney Peairs knew or should have known that serious injury or death were reasonably certain to result from this act. As our supreme court stated in Bazley, "[i]ntent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." Bazley, 397 So.2d 475, 482 (La.1981).
Because Rodney Peairs, at the time he pulled the trigger, clearly intended to harm the individual we now know to be Yoshi, in the mistaken belief that he was an intruder, his mistake is no defense. Rodney Peairs clearly intended to harm someone. See, 12 F. Stone, Louisiana Civil Law TreatiseTort Doctrine § 130(2) (1977). The trial court did not err in its determination that the shooting of Yoshi was an intentional act.
In brief, Rodney Peairs inexplicably asserts that if we uphold the trial court's determination that the shooting was an intentional act, then we must address the issue of whether an exclusion within the Farm Bureau policy operates to exclude coverage. Because Farm Bureau has previously paid its policy limits to the Hattoris, together with accrued interest thereon, and has subsequently failed to appeal, the question of whether the exclusion applies is not an issue in this appeal.
For the foregoing reasons, this assignment of error is without merit.

IV.
In his fourth assignment of error, Rodney Peairs asserts that the trial court misinterpreted Louisiana law by not apportioning fault to the other parties involved in this incident. Specifically, Rodney Peairs contends that both boysYoshi and Webb were at fault in this matter and that their actions contributed to the cause of this incident.
In brief, Rodney Peairs alleges that Yoshi caused or contributed to his death by failing to realize he had reached the wrong house, ignoring calls from Webb to return, failing to heed the directive to "Freeze," and finally, by failing to comprehend the danger posed by the gun. Similarly, Rodney Peairs also contends that Webb was at fault in bringing Yoshi to the wrong house, and thereafter, failing to adequately explain this fact to Yoshi. Rodney Peairs further asserts that it was foreseeable that Yoshi could have been injured in trespassing at night on property to which he had not been invited and at which he was not expected.
In his reasons for judgment, the trial judge stated that the actions of Webb did not constitute fault, and based upon our review of the record in this matter, we find no error in this determination.
The trial judge further found that "Rodney Peairs' conduct was intentional. That finding means the court will not make an inquiry as to whether there was any fault on behalf of Yoshi Hattori." Rodney Peairs argues that this is an incorrect application of Louisiana law, and cites Harris v. Pineset, 499 So.2d 499 (La.App. 2nd Cir.1986), writs denied, 502 So.2d 114, 117 (La.1987), and cases cited therein which hold that where a battery has been committed, the victim's conduct which helps to create the circumstances causing the injury can be taken into account in mitigating damages or apportioning fault.
Upon reviewing the cases cited by Rodney Peairs, we find that in each case, the plaintiff-victim initially provoked the difficulty in which he was injured; however, the defendant retaliated with more force than was necessary to repel the aggression. Because the victim voluntarily participated in the confrontation which resulted in his injuries, his damages were reduced accordingly. In the instant case, there has been no showing that Yoshi provoked the shooting, and for this reason, we find these cases to be inapposite.
As we have stated, the trial judge found the actions of Rodney Peairs to be intentional, and for this reason, declined to make a determination of whether Yoshi's actions that evening constituted fault on his part. Plaintiffs *517 correctly point out that until recently, the general rule in Louisiana has been that contributory or comparative negligence is not a defense to an intentional tort. Broussard v. Lovelace, 610 So.2d 159, 162 (La.App. 3rd Cir.1992), writ denied, 615 So.2d 343 (La. 1993); Ryland v. Law Firm of Taylor, Porter, Brooks, and Phillips, 496 So.2d 536, 542 (La.App. 1st Cir.), writ denied, 497 So.2d 1388 (La.1986); Andry v. Parish of Orleans, 309 So.2d 814, 815 (La.App. 4th Cir.1975).
Following the trial of this case, our supreme court in Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La. 11/30/94); 650 So.2d 712, examined the concept of comparative fault as it exists in Louisiana today, and whether this theory could be extended to encompass harms caused by intentional torts. The court noted that while several Louisiana appellate courts have recently applied comparative fault to intentional torts, other circuits, including this court, have declined to do so.
Holding that while Louisiana law is broad enough to allow a comparison of fault between intentional tortfeasors and negligent tortfeasors, the court in Veazey cautioned that the question of whether such a comparison should be made, must be determined by the trial court on a case by case basis in light of public policy concerns. The court in Veazey declined to "express any opinion ... as to whether, or in what situations, if any, victim fault should be compared to the fault of an intentional tortfeasor." Veazey, 650 So.2d at 719 n. 10.
In the instant case, the trial court declined to make a determination of whether fault on Yoshi's part contributed to his injuries. We find no error in this determination.
Under the facts before us, there can be no reasonable or rational explanation which would justify the use of deadly force by Rodney Peairs that evening. Because his actions were so extreme, we believe it would be poor public policy to compare fault in this situation. We similarly find this assignment of error to be without merit.

V.
In his final assignment of error, Rodney Peairs asserts that there was no evidence of an unusually close relationship between Yoshi and his parents, and therefore, the damages for wrongful death awarded to the Hattoris by the trial court were excessive and constitute an abuse of discretion. Similarly, Rodney Peairs contends that the amount awarded under the survivorship action was excessive in light of the length of time Yoshi was conscious after being shot.
Before a court of appeal can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its much discretion in making the award. La.Civ.Code art. 2324.1; American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991); Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976); Callender v. Delchamps, Inc., 542 So.2d 140, 144 (La.App. 1st Cir. 1989). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court noted that:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In the instant case, the testimony reveals Yoshi to have been a very caring, studious and respectful youth who loved sports and had many friends both in Japan and here in America. His parents were very proud of him and hoped he would grow up to be an "international person".
*518 In support of his contention that Yoshi and his parents did not enjoy the type of close family relationship which would justify the trial court's award of $275,000.00 to each parent, Rodney Peairs points to testimony which would indicate that "by any Louisiana standardand this is what should be used the Hattori family spent precious little time together." We cannot agree. Rodney Peairs has not cited, nor is this court aware of any jurisprudence which would require that persons of other cultures demonstrate conformity with an American or "Louisiana standard" as a condition of recovery for the wrongful death of a loved one.
In the words of the trial judge:
Even though we have different cultures, parents still love their children. The loss of a child, regardless of culture is devastating. The award for wrongful death, the award to the parents is based upon the closeness of the parents to the child and certainly it varies.
... [P]erhaps that relationship can best be summed up by Mrs. Hattori's comments. She was asked her reaction when she heard of the death of her son. And she stated that, "Part of my body is lost, a dream taken away."
This court can't sum it up any better than that. I certainly think that it was a close-knit family under the custom and culture of Japan and that an award of $275,000.00 per parent is well within the guidelines of prior wrongful death awards.
We cannot say that such an award constitutes an abuse of discretion.
With regard to the survival action, the trial court awarded the sum of $85,000.00 jointly to Yoshi's parents for the pain and suffering which Yoshi experienced from the time he was shot until his death. The trial judge found that "[t]he testimony is overwhelming that he suffered immensely from the gunshot wound until death, as evidenced from the testimony there was moaning, groaning, thrashing for almost thirty minutes." During this time, Yoshi remained conscious, and in the words of the EMS technician at the scene Yoshi was in "agony and fighting to stay alive." The amount awarded by the trial judge does not constitute an abuse of discretion.
For the foregoing reasons, we find this assignment of error to be meritless.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed at defendants-appellants' costs.
AFFIRMED.
FITZSIMMONS, J., concurs with reasons.
FITZSIMMONS, Judge, concurring with reasons.
I concur in the result. Under the facts and circumstances of this case, the acts of Mr. Peairs were unreasonable. However, with regard to the trial judge's statements regarding shutting the door of the home and waiting for the police, such a proposition if applied blandly, would have a detrimental and chilling effect on those persons and families that live in rural areas where police cruisers are not just a few minutes away. Moreover, I do not think that a connected, integral carport of a home constitutes a foreign or separate entity from the defendant's dwelling.
Additionally, I do not think that the cultural differences should have any bearing on the standard used to assess damages. Despite the fact that the mother of the decedent expressed grief and loss to the trial judge, the record does not indicate any substantial or significant interaction and dependence which would set this relationship apart from those in previously decided First Circuit cases. The standard to be applied here is that of the jurisprudence of this state and not the culture of Japan. Accordingly, I would find an abuse of discretion in the award of damages by the trial court under the facts and circumstances of this case. I find an award of $200,000.00 per parent to be appropriate.
NOTES
[1] Webb Haymaker testified that he could not remember whether he knocked on the front door of the Peairs' residence or rang the doorbell; however, the trial judge concluded that Webb rang the front doorbell.
[2] Yoshi's mother, Mieko Hattori testified that her son was nearsighted and wore contact lenses. Webb's mother, Holly Galland Haymaker testified that Yoshi had lost one of contact lenses, and for this reason, was not wearing his contacts that evening.
[3] There are discrepancies within the record as to whether Bonnie Peairs instructed her husband to get "a" gun or to get "the" gun; however, the trial judge concluded that Bonnie instructed Rodney to get "the" gun, which by implication, referred to the .44 magnum revolver.
[4] La.Code of Evid. art. 704 provides in pertinent part:

Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.
[5] La.Code of Evid. art. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[6] La.R.S. 14:20 provides:

A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
(3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling or a place of business while committing or attempting to commit a burglary or robbery of such dwelling or business. The homicide shall be justifiable even though the person does not retreat from the encounter.
(4) When committed by a person lawfully inside a dwelling or a place of business against a person who is attempting to make an unlawful entry into the dwelling or place of business, or who has made an unlawful entry into the dwelling or place of business, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises. The homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter.