768 So.2d 827 (2000)
Evelyn Taylor HARRIS, Plaintiff-appellee,
v.
Robert P. "Bob" CARTER, Sheriff of Morehouse Parish, et al., Defendant-appellant.
No. 33,951-CA.
Court of Appeal of Louisiana, Second Circuit.
October 4, 2000.
*829 Usry & Weeks by Freeman Matthews, Metairie, Counsel for Appellant.
Willie Hunter, Jr., Monroe, Counsel for Appellee.
Before NORRIS, WILLIAMS and CARAWAY, JJ.
CARAWAY, J.
This wrongful death and survival action results from the shooting death of a suspect by a police officer participating in a drug enforcement operation conducted by the Morehouse Parish Sheriff's Office. The trial court found that the use of deadly force by the officer was unreasonable and that the officer and the commanding *830 officer of the operation were at fault. The sheriff and officers appeal. Finding no manifest error in the trial court's rulings, we affirm.

Facts
This wrongful death and survival action was filed by Evelyn Taylor Harris ("Harris") against several defendants, including Billy Womack ("Womack"), Tony Griffin ("Griffin"), and Sheriff Robert P. "Bob" Carter (hereinafter collectively "Appellants"). Harris's son, David C. Taylor ("Taylor"), was killed by Griffin at the site of a drug "buy/bust" operation[1] in Bastrop, Louisiana. Sheriff Carter, who was not involved in the operation, was made a defendant because the deputies involved in the buy/bust were in the course and scope of their employment at the time of the shooting.
The scene of the nighttime drug enforcement operation was on a parking lot in front of a commercial business, The Hair Affair, and the shooting occurred as Taylor was walking away from the parking area to the back corner of The Hair Affair. Around that corner of the building, concealed in the dark, were officers Griffin, Robert Tappin ("Tappin"), and Tommy McGee ("McGee").
The facts of the drug enforcement operation and the shooting were extensively set forth in the trial court's thirty-page Reasons for Judgment. The trial court, with the agreement of counsel, visited the scene of the shooting at night to observe the scene's lighting conditions. After discussing the testimony of all witnesses, the trial court made forty-two rulings of fact. We will now describe the shooting and the events surrounding the "buy/bust" operation. The significant fact findings of the trial court are set forth below in quotations, with citations to the number of the fact ruling contained in the Reasons for Judgment ("RFJ # ").
On the night of the shooting, Taylor was driven from Monroe to the scene of the shooting by Tamma Gaylean ("Gaylean"), a confidential informant working with the Morehouse Parish Sheriff's Office. Gaylean enticed Taylor and his friend/accomplice, Frederick Lewis ("Lewis"), to go with her to sell approximately $450 worth of crack cocaine.
At around 7 p.m. on December 19, 1997, Gaylean drove Taylor and Lewis to the site of the "buy/bust" operation near the corner of Naff Street and Highway 139 in Bastrop. There they met Womack, who was posing as Gaylean's boyfriend and the intended buyer.
Deputy Womack was in charge of the police operation which involved nearly a dozen officers, with five officers being in the immediate vicinity of the parking lot and The Hair Affair. Most of the officers were armed. The takedown team, Griffin, Tappin, McGee, and Mike White ("White") were all wearing bullet-proof vests. In addition to the bullet-proof vest, Griffin also wore a bullet-proof helmet.
According to the trial court's description of the scene, Womack parked his truck between Naff Street and a concrete slab which was adjacent to the west side of The Hair Affair. Naff Street ran in front of The Hair Affair on its south side. The street light at the scene was described by the court as "bright." The light illuminated the western side of the building, and was located approximately 65 to 75 feet from the southern edge of the concrete slab near Naff Street.
The officers comprising the take down team were placed in different positions surrounding the parking lot and The Hair Affair. Womack stood near his truck, waiting for Gaylean to arrive with Taylor and Lewis. Womack was dressed in plain, street clothes, and testified that he was not carrying a weapon. White was concealed *831 to the west of the concrete slab in a tree line approximately 50 to 60 feet from the northwest corner of The Hair Affair. White's position allowed an unobstructed view of the west side of the building, including the northwest corner where Taylor was shot. Officers Griffin, Tappin, and McGee were located behind The Hair Affair in a "staggered" formation, with Griffin being closest to the northwest corner of the building, followed by Tappin and McGee. The testimony shows that the men were standing with their left shoulders to the wall of The Hair Affair, and that they were positioned very close to one another facing the west.
As Gaylean drove her car into the parking lot beside Womack's vehicle (driver's side to driver's side), Taylor and Lewis told Gaylean unexpectedly that they needed to first go urinate. Upon exiting Gaylean's vehicle, the two men proceeded to walk toward the back of The Hair Affair building where the three officers were hidden. Gaylean also exited the vehicle, and "when Ms. Gaylean told Sgt. Womack where the men were going, he told the officers behind the building that the men were coming at them or toward them and nothing more." (RFJ # 8). Womack said into his body microphone "watch um' Tony [Griffin]. They're coming right at you." "The officers behind the building were monitoring the bodymike worn by Sgt. Womack and heard his warning to them. They could also hear the men coming, apparently from the sound of their footsteps on the leaves on the concrete slab. Additionally, the bright street light was behind the men to the south/southwest. The shadow cast by Mr. Taylor's body would also give warning of when he would reach the corner of the building." (RFJ # 15). "Sgt. Billy Womack did not warn Mr. Taylor and Mr. Lewis that the officers were behind the building, nor did he stop them from going behind the building, despite testifying that he saw a shiny object in Mr. Taylor's hand the identity of which he did not determine, and despite the fact that the drug deal was never going to take placesince it was inevitable that the men were going to discover the officers." (RFJ # 13).
"Mr. Taylor was shot as soon as he reached the corner of the building." (RFJ # 18; emphasis added by trial court). The evidence established that Taylor's blood was found south of the northwest corner of the building, along the west side of The Hair Affair (Exhibit P-12). "Mr. Taylor did not make a hostile demonstration toward any officer or anyone else." (RFJ # 21). "There was no struggle between Mr. Taylor and Sgt. Griffin and ... Griffin did not illuminate Mr. Taylor with a flashlight." (RFJ # 19). "Immediately after the shooting, Sgt. Griffin said in the presence of Sgt. White, as Mr. Taylor lay there on the west side of the building with a Cross ink pen in his hand, `Oh my God. I thought he had a knife.'" (RFJ # 25).
According to Officer Griffin's testimony, which the trial court's findings of fact seriously discredited, he stated that when Gaylean, Taylor and Lewis arrived at the site, Womack gave the code word, "showtime," to indicate that the operation was going to begin. Griffin claims that he and the other officers maintained their position behind the building and monitored the radio. When Womack said "showtime," Griffin claims that he had his flashlight in his left hand, because it was dark behind the building. Then, Womack warned the officers that Taylor and Lewis were heading their way. Griffin testified that he then changed his body position to create more distance between himself and the corner of the building. Griffin drew his weapon out of the holster after Womack informed the team that the men were headed their way. He drew his gun, gripped the hand grip, and placed his finger on the side of the trigger. With his gun already in hand, Griffin then placed his right hand over his left hand, to a position wherein the "gun barrel and my light were facing in the same direction." Griffin stated that he *832 put his finger on the trigger when he heard Taylor coming around the corner. Furthermore, Griffin testified that "[w]hen Mr. Taylor rounded the corner, I illuminated him with my flashlight. At that time, I perceived what I believe (sic) to be a dangerous weapon in his hand.... I immediately perceived that to be danger to my life and danger to others at which point I said, "gun", (sic) and fired my weapon simultaneously."
Also filed in the record as Exhibit P-2 is the "Policy Procedures for Morehouse Parish Sheriff's Department." Much testimony was elicited about the officers' understanding of the department's policy providing for the use of deadly force "[w]hen committed in self-defense by a deputy who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the use of deadly force is necessary to save himself from that danger."
Based on all of the facts and evidence, the trial court concluded after the five day bench trial that Griffin "panicked and overreacted" in shooting Taylor. The trial court ruled that Griffin was 80% at fault, and Womack was 20% at fault for Taylor's death. Therefore, Sheriff Carter, as the deputies' employer, was found 100% liable. The trial court awarded $300,000 in damages for the wrongful death action, $15,000 for the survival action, and $3,700 for funeral reimbursement. From this judgment, defendants have suspensively appealed, and they argue three assignments of error.

Discussion
The two Louisiana Supreme Court cases in which the court reviewed claims for negligence involving police shootings are Kyle v. City of New Orleans, 353 So.2d 969 (La.1977) and Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318. While the trial court cited Kyle in its analysis, Appellants rely heavily on Mathieu and assert that the trial court misinterpreted the nature of the duty the deputies owed to Taylor by its failure to consider Mathieu. Additionally, however, Appellants assert that regardless of whether legal error existed in the trial court's ruling concerning the officer's duty, the trial court erred in its factual conclusions that Griffin and Womack did not follow a reasonable course of action when they encountered Taylor.
From our review of the record and the Kyle and Mathieu opinions, we find no legal error regarding the trial court's articulation of the duty owed by police officers. In Mathieu, the court discussed the duty as follows:
In Kyle, we held that police officers have a duty to act reasonably in effecting an arrest, and the force used must be limited to that required under the totality of the circumstances. In approaching a person whom the officer has reason to question, whether it be on the basis of a complaint made to the officer, the officer's own observations, or, as in the instant case, where a complaint has been made to the police department and relayed to the officer, we find no reason why the standard of "reasonableness under the totality of the circumstances" enunciated in Kyle should be any different.
Id. at 322. Citing Kyle, the trial court properly followed this standard of care which Mathieu confirmed.
Therefore, the issue before this court, as in Mathieu, is whether the trial court was manifestly erroneous in holding that the deputies breached the duty of reasonable care in their conduct of the buy/bust operation and in the shooting of Taylor. Breach of duty is a question of fact, or a mixed question of law and fact, and the reviewing court must accord great deference to the facts found and the inferences drawn by the finder of fact. Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225, 1231; Morrison v. Kappa Alpha PSI Fraternity, 31,805 (La.App.2d Cir.5/7/99), 738 So.2d 1105, writ denied, 99-1668 (La.9/24/99), *833 747 So.2d 1120, writs denied, 99-1607, 99-1622 (La.9/24/99), 749 So.2d 634, 635. An appellate court may not set aside a trial court's finding of fact in the absence of manifest error. Stobart v. State, Through D.O.T.D., 617 So.2d 880 (La. 1993); Rosell v. ESCO, 549 So.2d 840 (La. 1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Rosell, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra. If the trial court's findings are reasonable when the record is reviewed in its entirety then the appellate court will not reverse. Fowler v. Wal-Mart Stores, Inc., 30,843 (La.App.2d Cir.8/19/98), 716 So.2d 511; Hancock v. Safeway Insurance Co., 31,870 (La.App.2d Cir.6/16/99), 741 So.2d 155.

Was the trial court manifestly erroneous in determining that the deputies breached their duty to Taylor?
Our supreme court has stated several factors to be considered when determining breach, i.e., whether the force used by the officer was unreasonable under the circumstances. The factors enunciated in Kyle and used in Mathieu are:
(1) the known character of the arrestee;
(2) the risks and dangers faced by the officers;
(3) the nature of the offense involved;
(4) the chance of the arrestee's escape if the particular means are not employed;
(5) the existence of alternative methods of arrest;
(6) the physical size, strength, and weaponry of the officers as compared to the arrestee; and
(7) the exigency of the moment.
Mathieu, supra at 323. Before we consider the trial court's application of these factors in this case, a review of the two situations faced by the police in Kyle and Mathieu, as well as the supreme court's rulings in those cases, is instructive.
The plaintiffs in Kyle were injured while the police officers were attempting to enter their apartment with reasonable cause to make a warrantless arrest. The plaintiffs were suspects in an armed robbery of a New Orleans supermarket. A large contingent of officers surrounded the apartment building as five officers proceeded to knock on the door and announce their presence. After the plaintiff, Kyle, opened and slammed the door attempting to prevent entry, the police warned that they would "blow it open," and thereafter fired twice with a shotgun and once with a service revolver into the door to gain entry. The plaintiffs were injured by the gunfire.
The supreme court affirmed the trial court's determination that the police acted unreasonably, stating:
We recognize that police officers serve and protect the public at great risks to themselves. A felony arrest is often an emergency confrontation, requiring instantaneous, on-the-spot decisions. Hence, in these situations, police officers are not expected to act with the same clarity of judgment as others in the calm atmosphere of home or office. Nonetheless, under all the circumstances shown here, the use of deadly force was excessive. The apartment exits were covered; there was little chance of escape; the occupants made no attack on the officers. The officers could have delayed the arrest without great risk. Under these circumstances, we conclude that firing a shotgun blindly through the unlocked apartment door, knowing that someone was directly behind that door was unreasonable force.
Id. at 974.
In contrast to this ruling, the court found manifest error in the trial court's finding of officer negligence in Mathieu. In that case, two officers approached a man who appeared asleep or intoxicated *834 lying in a public area. The man became a suspect after a report of an armed individual acting suspiciously outside of the nearby nursing home. As the officers approached, the first officer saw a gun in the suspect's hand, and the officer drew his service revolver. As the officer moved closer, the suspect raised up and pointed the gun toward the officers. After gunfire from both officers, the suspect was seriously wounded.
In Mathieu, the court considered each of the seven factors listed in Kyle, supra, and specifically found that the trial court erred in its conclusion that the officers' choice to approach the sleeping or intoxicated suspect was negligent. The court said:
While the officers' method of approaching Mr. Mathieu may not, as plaintiffs argue, have been the "best" method of approach, officers are not held to that high a standard of care. [Citations omitted]. Instead, officers are simply held to choosing a course of action which is reasonable under the circumstances. In other words, the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best," or even a "better" method of approach.
Id. at 325.
When we compare these two cases with this buy/bust operation, we find significant differences in the levels of the overt showing of hostility which the suspects directed toward the police officers. In Mathieu, the suspect was directly pointing what appeared to be a gun toward the police officers when they reacted with violent force. In Kyle, the suspects were thought to be armed robbers, were apparently resisting a lawful arrest, and were possibly arming themselves within their apartment to harm the officers. In this case, we find that the evidence reasonably supports the trial court's conclusion that Griffin did not have evidence that Taylor was armed and that Taylor did not make a hostile gesture toward Griffin so that Taylor was killed "as soon as he reached the corner of the building." While we fully credit the possibility that weapons and danger may likely exist at the time of illegal drug transactions, the trial court could correctly determine from the facts of this drug scene that the first three factors listed above, concerning the known character of the drug suspect and the danger feared by Griffin, did not justify the use of deadly force. The general possibility for danger at this drug scene weighs considerably less than the danger encountered by the officers in Kyle, and does not compare to the known threat of danger faced by the officers in Mathieu.
The plaintiff's case in Mathieu rested largely upon the "alternative methods of arrest" factor. The supreme court, as quoted above, rejected the trial court's attempt to rate the officers' other options in approaching the suspect and to second-guess their choice. At the time the officers made that choice, the suspect appeared asleep and the risk that he might suddenly arise, pointing a gun at the officers was low. Appellants argue that the trial court in this case also overemphasized and second-guessed the officers' alternative methods in handling the "exigency of the moment" when Taylor and Lewis suddenly chose to leave the parking lot area and to head toward Griffin's hiding place. We disagree.
In measuring Griffin's conduct, we can agree with Appellants that he and the two other officers were not required to retreat further behind the building or to surprise Taylor and Lewis by coming forward around the corner into the lighted area before the suspects arrived at the back corner of the building. Nevertheless, the trial court's ruling did not find Griffin 80% at fault for staying hidden where he was and not choosing one of those alternative courses of action. The trial court's primary emphasis in viewing Griffin's actions was the lack of any hostile demonstration toward Griffin, the suddenness of Griffin's panicked ambush, and the lack of a reasonable belief on the part of Griffin that Taylor was armed.
*835 Considering Deputy Womack's different perspective of the events, the trial court ruled that "Womack should have stopped the men in the well-lit area on the west side of the building and not let them have a chance to go behind the building." Womack was the officer in charge of the buy/bust operation. Womack, who waiting at the scene outside his vehicle, was in the position to immediately observe Taylor and Lewis's movement toward the hidden officers. He stated that he saw something shiny in Taylor's hand. Womack had time to hear Gaylean's warning of the men's intentions to find a place to urinate, and he had additional time to warn Griffin. Under these circumstances, since Womack could not be certain that Griffin would hear and understand his warning, the trial court's conclusion that Womack should have acted to stop the men to prevent a surprise encounter between the men and the officers is a reasonable view of the evidence, thus supporting the trial court's finding of fault. This alternative course of action existed in a situation where the risks of danger had suddenly increased. Nevertheless, like the officers in Kyle who acted unreasonably in failing to abort their entry into the apartment, the trial court's determination that Womack breached his duty to Taylor in failing to control the operation before the risk further escalated is not clearly wrong.
Finally, from our review of the record, the trial court made a credibility determination in rejecting the account of the shooting offered by Griffin and in concluding that Griffin shot Taylor without warning before any threat of danger was directed toward him. Based upon the evidence of the location of Taylor's body, Taylor's lack of knowledge that anyone, much less police, was behind the building, and the testimony of the other officers, we hold that the trial court's findings in this regard are not manifestly erroneous. This was a very thorough and reasonable evaluation by the trial court which we may not disturb. Accordingly, the trial court's conclusions regarding the officers' negligence are affirmed.

Did the trial court err in failing to allocate a portion of the fault on Taylor?
Appellants contend that Taylor had embarked on an illegal and dangerous enterprise which posed a substantial danger to himself and others and that because of his actions, he should be allocated a portion of the fault. Based upon the trial court's view of the shooting, we find no error in the court's conclusion that Taylor was not negligent under these circumstances. The trial court's description of the shooting was that Taylor directed no threatening movement toward Griffin. The trial court ruled that no warning by Griffin was communicated to Taylor. Therefore, the evidence supports the conclusion that Taylor was shot without any knowledge that a police officer was in the darkness behind the building. This assignment of error is rejected.

Did the trial court abuse its discretion in awarding damages?
Lastly, Appellants challenge the trial court's awards for wrongful death and survival action damages. Appellants argue that neither award finds any justification in the record, nor by comparison to prior awards in similar cases. Appellants likewise assert that the trial court's reliance on Hattori v. Peairs, 95-0144 (La.App. 1st Cir.10/6/96), 662 So.2d 509, is not factually relevant to the present case, and that the damage awards do not find support in previous jurisprudence.
La. C.C. art. 2324.1 provides that much discretion is left to the judge or jury in the assessment of damages in cases of offenses, quasi offenses, and quasi contracts. Before a court of appeal can disturb an award made by the trial court, the record must clearly reveal that the trier of fact abused its much discretion in making the award. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991); Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1976).
*836 The appellate court's function is not to determine whether a different damage award may have been appropriate, but whether the trial court's award is reasonably supported by the record and justifiable inferences from the record. Summarell v. Ross, 27,160 (La.App.2d Cir.8/23/95), 660 So.2d 112. Only after an abuse of discretion is shown may a reviewing court resort to prior awards in similar cases. Reichert v. State, Department of Transportation, 96-1419 (La.5/20/97), 694 So.2d 193.
Taylor was 21 years old at the time of his death. He quit school after the ninth grade. He participated in a Job Corps program in Oklahoma, but worked irregularly in construction and restaurant jobs. Although he had a room in his mother's home, Taylor was not living with her at the time of his death. When Taylor was at his mother's home, he helped with chores and would, from time to time, assist his mother with paying certain household bills.
Dr. Earl H. Baker, Harris's psychologist, testified that Harris appears to be depressed most of the time, that she appears morose and melancholy, that she experiences sleep problems, and that she experienced significant psychological upset stemming from the death of her son. Dr. Baker further opined that Harris was genuinely experiencing limitations due to her psychological problems, and that he did not feel as though she was exaggerating her responses.
Other witnesses, including Harris's friends and family, testified as to the closeness shared between Harris and Taylor, and as to how Taylor's death has affected Harris both at home and at work.
Furthermore, Dr. Steven Hayne provided uncontradicted expert testimony at trial that Taylor lost consciousness in the period of approximately 30 seconds after being shot. The medical examiner also testified that Taylor's heart and lung were pierced by the large caliber bullet fired at close range from Griffin's gun.
On this record, we do not find an abuse of discretion in the trial court's damage awards.[2]

Conclusion
For the foregoing reasons, the judgment of the trial court is hereby affirmed. Costs of these proceedings are assessed to appellants.
AFFIRMED.
NOTES
[1] The operation involves the sale of illegal drugs by a suspect to undercover officer(s) and the immediate arrest of the individual.
[2] We also note other cases containing similar awards for the loss of an adult child. See Gladney v. Sneed, 32,107 (La.App.2d Cir.8/18/99), 742 So.2d 642, writ denied, 1999-2930 (La.1/14/00), 753 So.2d 215 (award of $315,000 to father for wrongful death of 25-year-old daughter was not abuse of discretion); Bryant v. Solomon, 97-2008 (La.App. 4th Cir.3/25/98), 712 So.2d 145 (affirming an award of $300,000 to one parent for the wrongful death of an adult daughter); Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3d Cir.2/15/95), 651 So.2d 865, writs denied, 95-0667, 95-0676 (La.4/28/95), 653 So.2d 592, 593 (award of $325,000 per parent for loss of 18-year-old son was not manifestly erroneous).