liMOORE, J.
The plaintiffs, Thomas and Marjorie Cu-pit, appeal a jury verdict that rejected their personal injury claims against the state of Louisiana, arising from a rear-end collision in which Mr. Cupit was involved on the Interstate in West Monroe, Louisiana. For the reasons expressed, we affirm.

Factual and Procedural Background

The accident happened on the bright, hot midmorning of July 18, 1994, on the eastbound side of Interstate 20, just west of the South 5th St. on-ramp in West *38 Monroe. Running through West Monroe, the Interstate has two lanes; however, the South 5th St. entrance creates a third lane on the right side. This lane continués over the bridge but is an exit-only lane for the Jackson Street exit in Monroe. Between the west and eastbound sides, there is a short, solid concrete barrier and, on top of this, a small “glare” fence. Also, shortly before the South 5th St. entrance, the Interstate makes a curve to the left. A state policeman testified that this was so the bridge could cross the river at a right angle.
Cupit was driving east in his employer’s 1988 Chevy pickup truck in the right lane at about 55-60 mph. He approached the South 5th entrance and saw several vehicles trying to merge into his lane. He testified that he looked to make sure he could shift to the left lane. It was safe, so he started to move over. He testified, however, that he rounded the curve and suddenly saw that the vehicle ahead of him in the left lane, a 1977 Chevy pickup driven by Gladys Vines, was virtually at a standstill. Unable to stop, he rammed into the back of Ms. Vines’ truck and then spun into the concrete barrier, sustaining serious injuries. Propelled forward, Ms. Vines’ truck | ¡¡¡struck the rear of the car in front of her, a Mercury Cougar driven by 15-year-old Cindy Estep.
Ms. Estep and Ms. Vines were driving slowly because ahead of them in the left lane was a street sweeper operated by the State Department of Transportation and Development. Ms. Vines described crawling behind Ms. Estep at 5-6 mph for about 10 minutes, unable to change lanes because of heavy traffic, but both she and Ms. Estep could see the sweeper and stopped before running into it. (Even after the impact, Ms. Estep’s car did not strike the sweeper, which continued its route across the river.) Another witness, Robert Gammell, was driving behind Cu-pit. In a deposition he said he saw the vehicles collide, but at trial he admitted he only saw them coming to rest. All these witnesses — Ms. Estep, Ms. Vines, and Gammell — insisted there were no lights of any kind on the sweeper; Ms. Vines’ daughter, a passenger in the front seat of her truck, corroborated this. They also testified that they saw no utility vehicle (or “shadow truck”) following the sweeper with an arrow board. Ms. Vines’ husband, who was driving another pickup some distance ahead of his wife, testified that he saw an arrow truck driving ahead of the sweeper.
Willie Hardwell, who was driving the sweeper, described his daily inspection routine and admitted that on the day of the accident, the arrow board on the sweeper was not working, but he was positive that all the other safety lights were functioning. He took the sweeper to the mechanic’s shop; his supervisor, Vernon Trichell, told him to use the sweeper anyway, as he would be followed by a shadow truck with an arrow board mounted on its |c.cab; Trichell corroborated this. Johnny Ray Willis, who drove the shadow truck, confirmed that the sweeper’s arrow board was broken, but all its other lights, as well as his own arrow board, were working. Both HardweU and Willis testified that the shadow truck kept a fairly steady distance of four to five car lengths behind the sweeper and never got ahead of it.
Donald Tolar, the state’s district engineer administrator, was accepted as an expert in traffic engineering and highway maintenance. He testified that a street sweeper drives at an average of 4-5 mph and confirmed that the procedure followed on July 18, 1994 met the department’s policy and the standards of the Louisiana Maintenance Handbook. The state’s traffic engineering and accident reconstruction *39 expert, Dr. Joseph Blaschke, testified that the state’s procedure complied with the La. Maintenance Handbook and a federal guide, the Manual on Uniform Traffic Control Devices (“MUTCD”). Based on his accident reconstruction, he concluded that Cupit should have been able to see the slow vehicles ahead of him and should have stopped before rear-ending them. He ascribed the accident to Cupit’s “driver error.” Cupit did not present any accident reconstruction evidence.
As a result of the accident, Cupit sustained extensive injuries, including a smashed hip and deep lacerations to both hands. Six months after the accident, he underwent a hip replacement, resulting in a 26% total disability. He testified that he still has a trigger finger that keeps him from gripping tools properly. Because of his injuries he had to quit his job as a tanker driver and handyman at Magnolia Petroleum; he has done two short |4stints as a truck driver but had to give these up because he cannot stay seated for long periods of time. He also had to give up the “fix-it” business he ran from a large shop behind his house in West Monroe.
Cupit and his wife filed this suit against the state, urging theories of strict liability and negligence. They sought damages for Cupit’s medical expenses, loss of wages and earnings capacity, permanent disability and general damages; they also claimed Mrs. Cupit’s loss of consortium. The state asserted plaintiffs fault and comparative fault, and demanded a jury trial. The accident occurred while Cupit was on the job, so his employer’s compensation carrier, LWCC, intervened to recover indemnity, medical and rehabilitation benefits paid on his behalf. At the time of the pretrial statement, these payments exceeded $90,000. Jury trial took place over five days in April and May 2002.
In response to special interrogatories, the jury found (1) the street sweeper in this case did not pose an unreasonable risk of harm, and (2) the state was not negligent and responsible for this accident. The district court rendered judgment on June 21, 2002, rejecting all claims of the Cupits and LWCC. Cupit filed a motion for new trial or, alternatively, JNOV. After arguments, the court denied this motion without reasons on September 5, 2002.
Cupit brought this appeal, contesting the June 21 judgment by four assignments of error. LWCC filed a letter adopting Cupit’s position.
| sDiscussion: Breach of Duty
By his first assignment of error, Cupit urges the jury committed manifest error in failing to find an unreasonable risk of harm in the “presence of a street sweeper within the custody of the state without lights in a vision obscured curve on the interstate without warnings to motorists.” By his second assignment, he urges the state was negligent.
The argument is intensely factual, bearing down on the testimony of Cupit, Ms. Estep, Ms. Vines, her daughter and husband, and Gammell, all of whom maintained that the sweeper had no arrow board or any other fights or warnings, and that the shadow truck was not riding behind the sweeper. Accepting this scenario, Cupit urges that the sweeper did not comply with the La. Maintenance Handbook or the MUTCD and therefore breached its duty of care to Interstate motorists like himself.
The state responds that the jury’s findings were reasonable and not manifestly erroneous. The state contends that its sweeping operation met the standard of care. Traweek v. Jackson, 30,248 (La.App. 2 Cir. 2/25/98), 709 So.2d 867. It disputes each of Cupit’s factual assertions, citing Willis and Hardwell’s testimony as ade *40 quate support for the findings that the sweeper’s rear and top fights were working and that the shadow truck was behind the sweeper. The state also submits that there was no visual obstruction, as every other vehicle on the Interstate managed to stop without rear-ending anything. Finally, the state argues that Cupit called no expert to contradict the opinion of Donald Tolar and Dr. Blaschke that the sweeping operation complied with the La. Maintenance Handbook and MUTCD and Rthus met the proper standard of care.
The state owes the duty of maintaining public roads in a safe condition to prevent exposure of the public to unreasonable dangers. La. R.S. 48:35. This includes providing proper safeguards or adequate warnings of dangerous conditions on the highway, including those engendered by ongoing road repair. Traweek v. Jackson, supra.
Breach of duty is a question of fact, or a mixed question of law and fact; the reviewing court must accord great deference to the facts found and the inferences drawn by the finder of fact. Boykin v. Louisiana Transit Co., 96-1932 (La.3/4/98), 707 So.2d 1225; Harris v. Carter, 33,951 (La.App. 2 Cir. 10/4/00), 768 So.2d 827, writ denied, 00-3056 (La.1/5/01), 778 So.2d 602. A trial court’s finding of fact may not be reversed absent manifest error or unless clearly wrong. Lasyone v. Kansas City Southern R., 00-2628 (La.4/3/01), 786 So.2d 682, and citations therein. The issue is not whether the jury was right or wrong, but whether its conclusion was a reasonable one. If the jury’s findings are reasonable in fight of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Housley v. Cerise, 579 So.2d 973 (La.1991). As in Lasyone, supra, a manifest error review is applicable to the fact-driven determinations of the instant case.
The La. Maintenance Manual establishes the minimum requirements for a moving operation, faster than 2 mph in multi-lane and two-lane roads:
|7Work Vehicle Mounted With:
Warning Sign
Flashing Amber Light
(Flags Optional)

NOTE:

On multi-lane road a flashing arrow board is optional.

NOTE:

If sight obstructions exist along the intended route, a second vehicle is required for traffic control. The rear vehicle is equipped with warning sign and flashing amber fight. Flags are optional.
Compliance with this regulation is sufficient to discharge the state’s duty of reasonable care to warn motorists of street sweeping operations. Traweek v. Jackson, supra.
Dr. Blaschke also testified that under the MUTCD, a mobile operation is one moving 3 mph or faster; a street sweeper in a high speed or high traffic area should be followed by a shadow truck equipped with a flashing arrow display.
The experts agreed that a street sweeper drives at an average of 4-6 mph. Ms. Vines and her daughter gauged their speed behind the sweeper at 5-10 mph; Hardwell admitted that at times he may have dropped as low as 3 mph. This evidence shows that the sweeper was a moving operation under the La. Maintenance Manual and a mobile operation under the MUTCD.
*41 The testimony as to which lights were functioning on the sweeper was conflicting. Ms. Estep testified that driving directly behind the sweeper, she saw it had no fights of any kind. Ms. Vines, in the next following vehicle, also testified that she saw no fights on the sweeper; she was somewhat corroborated by her daughter[1] and her husband, who was | sdriving a separate vehicle some distance ahead of his wife. Gammell testified that from a distance, he saw flashing fights and assumed they were on the sweeper, but when he got close enough he saw no fights on the sweeper. Cupit testified that he never saw the sweeper.
By contrast, Hardwell testified that the arrow board was out of service but the broom lights, back fights and dome fight were all working. Willis, the driver of the shadow truck, also testified that the sweeper’s arrow was out, but its dome fight and tail fights were working. Both Hardwell and Willis were positive about the fights. Tolar, the district administrator, testified that if all the sweeper’s fights had been out, it would not comply with the La. Maintenance Manual and he would not send it on the road. He did not say that he personally inspected the sweeper, but indicated that the other fights must have been working because he sent it out with the “optional” shadow truck.
Based on this record, the jury was entitled to accept the direct testimony of Willis and Hardwell, and the inferences provided by Tolar, that the sweeper’s dome fight and back fights were working. The opposite view is rational but the jury’s decision to reject it is not manifestly erroneous. Lasyone, supra; Stobart v. State, 617 So.2d 880 (La.1993).
The same rationale governs whether the shadow truck was behind or ahead of the sweeper. Ms. Estep and Ms. Vines testified that they were directly behind the sweeper, not the shadow truck; Mr. Vines testified he saw an arrow truck in front of the sweeper; Gammell saw fights on a vehicle that may have been ahead of the sweeper. Hardwell and Willis were | flpositive that the shadow truck remained behind the sweeper at all times, and Tolar, the district administrator, was adamant that this was their normal practice. Admittedly, if Willis was behind the sweeper, it is hard to understand his claim that he did not hear the 55-mph rear-end collision and chain-reaction crash which must have occurred a short distance behind him. Nevertheless, the jury’s decision to accept the state’s version is not unreasonable. Lasyone, supra; Stobart v. State, supra.
In fight of these findings, the jury was entitled to conclude that the state’s sweeping operation complied with the La. Maintenance Manual and did not pose any unreasonable risk of harm to other motorists on the Interstate. Traweek v. Jackson, supra.
This argument that the state breached its duty of care lacks merit.

Causation

By his second assignment, Cupit also contends that the jury erred in failing to find that the state’s conduct caused his damages. In support, he argues that after seeing the police photographs at trial, Dr. Blaschke admitted the accident probably occurred “a little further to the east” than he had assumed. Because the expert mis-reckoned the actual site of the accident, Cupit contends that his opinion regarding causation should be disregarded. Cupit *42 also argues that because of heavy traffic conditions and the curve in the road, he was not responsible for causing the accident.
The state urges that the jury was not plainly wrong to accept Dr. Blaschke’s opinion that the accident resulted from Cupit’s driver error, especially in light of Cupit’s admission that he took his eyes off the road | inmomentarily before he switched lanes. The state stresses that Cupit called no expert to dispute Dr. Blaschke’s calculations and conclusions.[2] Finally, the state contends that as the rear driver in a rear-end collision, Cupit is presumed to be at fault. Traweek v. Jackson, supra.
The finding of causation, like the finding of an unreasonable risk of harm, is factual and subject to manifest error review. Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606; Methvin v. Ferguson, 35,138 (La.App. 2 Cir. 9/26/01), 796 So.2d 712.
Dr. Blaschke presented a cogent theory of how the accident occurred. He testified without contradiction that there was a sight distance of at least 600 ft. at all points in the curve. He calculated that driving 55 mph, Cupit should have been able to stop his truck within 225-270 ft., allowing for a normal reaction time of Vh seconds and a coefficient of friction of 0.7. Dr. Blaschke also noted that Cupit told Sgt. Aldridge, a West Monroe police officer, that he “looked away for a moment” before changing lanes, and when he looked back, Ms. Vines was “practically stopped directly in front of him.” The police report was not offered in evidence, but Sgt. Aldridge confirmed that Cupit told him this in the ambulance. Dr. Blaschke thus found that sight obstructions (curve and glare fence) did not play a part in the accident, a conclusion supported by the numerous photos of the Interstate offered in evidence. These disclose that the road makes a broad turn to the left, but no “blind curve.”
InThe jury was surely cognizant of the curve and glare fence, as well as the dense traffic present at the time of the accident, and perhaps that Cupit changed lanes as a courtesy to vehicles trying to enter the Interstate from South 5th St. However, the jury could also find that Cupit caused the accident by looking at traffic on the entrance ramp instead of scanning the left lane before moving over. On this record, the jury was entitled to accept Dr. Blasch-ke’s theory that driver error caused the accident. Notably, Cupit offered no alternative accident reconstruction theory. Based on this record, the jury was not plainly wrong to find that the state’s conduct was not negligent and did not cause Cupit’s injuries.
For these reasons, Cupit’s argument that the jury should have found causation lacks merit.

Other Assignments of Eiror

By his third assignment, Cupit urges the district court erred in denying his motion for JNOV or, alternatively, new trial. Because of the alleged manifest error in the jury’s verdict, Cupit argues the judge abused his discretion in failing to grant one of these motions.
A new trial shall be granted when, inter alia, the verdict or judgment appears clearly contrary to the law and the evidence. La. C.C.P. art.1972(l). The decision to grant a new trial is discretionary, but cannot result from the judge’s disagreement with the verdict. The verdict *43 should not be set aside if it is supportable by any fair interpretation of the evidence. Davis v. Wal-Mart Stores Inc., 00-0445 (La.11/28/00), 774 So.2d 84. In other words, the judge cannot usurp the jury’s fact-finding role. Martin v. h?Heritage Manor South, 00-1023 (La.4/3/01), 784 So.2d 627. For the reasons already discussed, the jury was entitled to accept the state’s account of the facts surrounding the accident and its expert’s theory of causation. The verdict is supportable by a fair interpretation of the evidence and the court did not abuse its discretion in denying a new trial.
For similar reasons, JNOV was not warranted. The facts and inferences in this record do not approach the “strong and overwhelming” standard of showing that reasonable persons could not have reached a verdict in the state’s favor. Joseph v. Broussard Rice Mill, 00-0628 (La.10/30/00), 772 So.2d 94; Smith v. American Indem. Ins. Co., 598 So.2d 486 (La.App. 2 Cir.), writ denied, 600 So.2d 685 (La.1992).
By his fourth assignment, Cupit contests the court’s failure to award damages for the injuries and expenses sustained by him and his wife. Because we have found that the state has no responsibility or liability, we pretermit any consideration of damages. Bison v. Primrose, 30,011 (La.App. 2 Cir. 12/10/97), 705 So.2d 249, writ denied, 98-0090 (La.3/13/98), 713 So.2d 471.
These assignments lack merit.

Conclusion

For the reasons expressed, the judgment is affirmed. Costs are assessed to the plaintiffs, Thomas D. Cupit Sr. and Marjorie Cupit.
AFFIRMED.

. The daughter, Ms. Crocker, is developmentally disabled and her deposition provides very few details about the accident.

. In a pretrial statement, counsel listed S.C. Walker as Cupit's accident reconstructionist, stating that either he or another reconstruction expert "will offer testimony at trial.” R.p. 73. However, the plaintiff did not call Mr. Walker or any other expert in accident reconstruction to testify.