hLOVE, Judge.
Defendants, The City of New Orleans and Sheriff Harry Lee, appeal the trial court’s judgment awarding damages to the plaintiffs for an unreasonable search during an attempt to execute an arrest warrant at the wrong house. The trial court found that the plaintiffs were subjected to humiliation and some physical injury as a result of the arrest attempt. For the following reasons, we affirm the judgment of the trial court because we find that the New Orleans Police Department (“NOPD”) and the Jefferson Parish Sheriffs Office (“JPSO”) acted unreasonable in searching the Ross home. However, we find that the trial court erred in finding the NOPD solely responsible for the injuries sustained as a result of the search. Therefore, we find that the JPSO is responsible for the injuries to Arthur Ross and reverse that portion of the judgment.

FACTS AND PROCEDURAL HISTORY

On February 15, 1992, members of the NOPD were asked to assist the JPSO in effectuating an arrest warrant issued by the 24th Judicial District Court for the Parish of Jefferson. The subjects, Sherman Bates and Julian Ross were wanted for attempted murder of a police officer and one of the subject’s last known address was in the 4700 block of Frenchmen Street in Orleans Parish.
|P,After arriving at the 4700 block of Frenchmen Street, the officers were told that one of the subjects was located at 1312 Frenchmen Street, the home of Vivian and Arthur Ross. Therefore, the officers went to 1312 Frenchmen Street and conducted a search for the subjects. Plaintiffs testified that they informed the officers that they did not know the subjects and the subjects were not inside of their residence. However, the plaintiffs assert that the NOPD proceeded to “dishevel their belongings, strike petitioners, threaten them, deprive them of their civil liberties and cause them to sustain physical and emotional damage.” Conversely, the NOPD maintains that they conducted a room-by-room search of the premises and left the residence after verifying the subjects were not present. The JPSO argues that they entered the premises but did not cause any harm or damage to the home or its residents.
The trial court rendered judgment solely against the City of New Orleans and found that they caused humiliation and some physical injury to the plaintiffs. Specifically, the court awarded the following damages: Vivian Ross, $10,000 for humiliation; Arthur Ross, $15,000 for humiliation; Ronald Davis, Chandra Davis and Sandra Davis, $2,500 each; Cynthia Bernard, $10,000; and Kevin Hudson, $5,000.
The court exonerated Sheriff Harry Lee and found “the testimony showed that at no time did the defendant, Jefferson Parish Sheriffs Office, enter the home of plaintiffs.” This is factually incorrect and will be discussed below.

Pertinent Testimony Adduced at Trial

Mrs. Vivian Ross

Mrs. Vivian Ross testified that on August 15, 1992, police officers pushed her front door open and broke the locks on her back door. She stated that the | ¡¡officers did not announce their presence and she did not grant them permission to enter her home. Mrs. Ross said the officers entering from the front were from the NOPD and the officers entering from the back were from the JPSO. She further testified that a female officer with blonde hair entered the room of her daughter, Cynthia *755 Bernard and demanded she get up from under a blanket. Ms. Bernard has Cerebral Palsy and is unable to walk. Additionally, Mrs. Ross testified that once the officer realized Ms. Bernard could not move, she continued to search the room with a gun and then left after not finding the subjects. Mrs. Ross testified that the female officer was in the room for approximately fifteen minutes and after the police officers left the premises Ms. Bernard suffered a seizure. Mrs. Ross also informed the court that her blood pressure escalated as a result of the incident and she had trouble sleeping. Mrs. Ross sought treatment from her Internist, Dr. Magee.

Mr, Arthur Ross

Arthur Ross testified that he has been living at 1312 Frenchmen Street for approximately thirteen years. He stated that at the time of the incident he was working for the Annex of New Orleans were he is now retired after thirty years of service. Mr. Ross testified that on the night of February 15, 1992, he was in his house watching television with his family when a female police officer came rushing through his front door without identifying herself and pointing a gun. He said he later identified the officer as been affiliated with the NOPD. Mr. Ross furthered testified that the female officer left the room and entered the room where Cynthia Bernard was located. After the female officer left the room, Mr. Ross said an African-American officer from JPSO entered the room and placed him against the wall. Mr. Ross said the officer twisted his right arm while he was against the 14wall. Mr. Ross’ arm was twisted for about two minutes. Additionally, Mr. Ross testified that during the entire search the officers had their guns drawn and he felt degraded as a result of the incident because he could not do anything for his family. After the officers realized' that they were in the wrong house, Mr. Ross testified that an officer from the JPSO asked him his name and then asked if he knew a Julian Ross or a guy by the name of Pony Tail. Mr. Ross informed the officers that he did not know either of the individuals. Mr. Ross testified that the officers did not apologize for their search of the home. Mr. Ross testified that his arm was swollen as a result of being pinned against the wall and he missed two days from work. Lastly, Mr. Ross said he feared for his life and the life of his family during the search of the home.

Ms. Cynthia Bernard,

Ms. Bernard’s testimony was difficult to understand because she has Cerebral Palsy and is hampered by a speech impediment. However, she demonstrated for the court how she was lying down on a mattress when an officer pointed a gun to her head. Mrs. Ross testified that Ms. Bernard had trouble sleeping for months after the incident and she had to sleep in her room on many occasions in order to give Ms. Bernard a sense of security.

Kevin Hudson

Kevin Hudson was nine at the time of the incident. He testified that on August 15, 1992, he was playing cards with his cousin, Sandra, when he heard the front door break. Shortly thereafter a female officer with blonde hair entered the room and kicked the cards out of Sandra’s hands while holding a gun to her head. Kevin’s cousins, Brian and Ronald, were also in the room. Kevin identified the officer as being an officer with the NOPD and further testified that the officers | Rmade them walk in a straight line and leave the house. While exiting the house, Kevin testified that the African-American officer from the NOPD pushed him down the steps and he fell on his arm and broke his front tooth. Kevin was treated at Charity Hospital and later saw Dr. Barry Goodspeed who rec *756 ommended he have a root canal and a crown placed over the tooth.

Ronald Davis, Jr.

Ronald was eight years old at the time of the incident. He testified that he was living with his grandmother, Vivian Ross, in August of 1992. Ronald said he was sleeping when the police first entered the room and when he woke up there was a man standing in his face. Ronald described the man as an African-American officer. The officer had a gun pointed and demanded that he tell him about a guy name Pony Tail. The officer walked him to the front door in a line with his sisters, Sandra and Chandra Davis, and his cousins, Brian and Kevin. Ronald said the officer had his gun out and while exiting the house he observed the other officers with guns pointed toward the heads of his grandparents, Vivian and Arthur Ross. Ronald also testified that he saw Kevin lying on the ground crying and bleeding and his sister Chandra was placed against a car. Kevin testified to feeling scared because he did not trust guns. He also had trouble sleeping after the incident and missed three days of school.

Sandra Davis

Sandra was ten years old on the date of the incident. She testified that she had been living with her grandmother, Vivian Ross, for about seven years. Sandra testified that she was in the third bedroom with her brother and cousin on the night of August 15, 1992. Sandra said she was playing cards with Kevin when a female officer with blonde hair came into the room and kicked the cards out of her hands. | fiSandra testified that the officer had a gun pointed to her head and then scanned the room with the gun and then left to enter Ms. Bernard’s room. Sandra identified the officer as a NOPD officer. Sandra stated that she was very frightened because she had never seen a real gun. Sandra testified that after the female officer left the room another officer entered and made them exit the room in a single file line. Sandra stated that a police officer caused Kevin to fall down the steps. She asked Kevin if he was okay and then she wiped his mouth. Sandra said she had never seen so much blood and none of the officers offered any assistance. Sandra testified that after the incident she had trouble sleeping for about a month.

Chandra Davis

Chandra was fifteen at the time of the incident. She testified that she was sitting on the steps outside of her house with two friends when the police entered the house. She said there were a lot of police officers and some entered through the front door and some from the back door. Chandra further testified that a female officer with blonde hair from the NOPD told her to stand against the car and not to move “before she blow my head off.” Chandra said she was scared and believed the officer would shoot her if she moved. Chandra testified to standing against the car for approximately forty-five minutes.

Officer Pedro Eneas

Officer Eneas was a sergeant for the NOPD on August 15, 1992. He testified that he is half black and half Hispanic. Officer Eneas testified that on August 15, 1992 he went to 1312 Frenchmen Street to assist officers from the JPSO with an arrest warrant for Julian Ross and Sherman Bates. Officer Eneas stated that they did not have a search warrant. He stated that he and Officer Wiggington were from the NOPD and they entered the Ross residence through the front door. Officer 17Eneas identified Officer Wiggington as a white, female officer with blonde hair. The officers did not find either of the subjects in the home. Officer Eneas testified that he and the other officers knocked on the door and were given access into the *757 home. He furthered testified that neither he nor Officer Wiggington had their guns drawn except for when they checked a closet in the home. He stated that he could see Officer Wiggington the entire time he was in the home and did not see her pull the blanket off of Ms. Bernard. Officer Eneas testified that they left the residence after not finding the subjects. He also stated that the emergency unit was called to the scene as standard police procedure.

Officer Richard Robinson

Officer Robinson testified that he works for the JPSO and was notified on August 15, 1992 of an attempted murder of a police officer. Officer Robinson said he traveled with the other officers because he had previous dealings with Sherman Bates and could readily identify Mr. Bates. Officer Robinson further testified that Officer Eneas and Officer Wiggington knocked on the front door of the residence, Captain Beujol went to the side of the residence and Sergeant Saacks went to the back of the house. Officer Robinson testified that Officer Wiggington was the only female officer on the scene. He also stated that the officers asked if the subjects were in the home and someone said “Pony Tail isn’t here, but you’ll can come in and look if you want to.” Officer Robinson testified that they went through the house as expediently as possible and left after the subjects were not found in the house. He testified that the incident only lasted about fifteen minutes. Officer Robinson also testified that he did not see any police officer point a gun at anyone in the house. He furthered testified that none of the residents complained of any injury and nothing was broken in the home.
| sLieutenant Jerry Kreider
Lieutenant Kreider is employed by the NOPD’s Internal Affairs Division. He testified that on August 17, 1992, two days after the incident, Mrs. Ross and three children lodged a complaint, alleging that officers entered her home with guns drawn. Lieutenant Kreider said Mrs. Ross informed him that an officer raised the sheet on her bed-ridden daughter; that one of the children had a gun put to her head; and Mrs. Ross said she was upset about the EMS unit being on the scene. Lieutenant Krieder further testified that Kevin Hudson complained of having being pushed down the stairs and chipping his tooth.

STANDARD OF REVIEW

The standard of review for appellate courts was ideally articulated in Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993):
A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder’s determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Id.; See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Nevertheless, the issue to be resolved by a reviewing court is not whether the *758 trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though , an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that “the reviewing court must always keep in mind that ‘if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)). This court has recognized that “[t]he reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.” Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, were two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.

LAW AND ANALYSIS

Assignment of Error NO. 1
JPSO: The Trial Court’s Decision Exonerating Sheriff Lee Is Not Manifestly Erroneous Or Clearly Wrong: The JPSO Possessed A Valid Warrant, Which Was Executed Properly And Without Excessive Force.
NOPD: The Trial Court’s Finding Of Liability On The Part Of Defendants Herein Is Contrary To The Law and Evidence And Constitutes An Abuse Of Discretion.
In their briefs, defendants, JPSO, focus on the fact that they had a valid arrest warrant. We pretermit discussion on the warrant issue because the germane | inissue is whether the police officers exercised reasonable force in attempting to execute the arrest warrant.
In Kyle v. City of New Orleans 353 So.2d 969 (La.1977), the Louisiana Supreme Court enunciated a standard of conduct for police officers to follow when making an arrest. The court stated that the use of force by law enforcement officers must be tested by the “reasonable force” standard established by La. C.Cr.P. art. 220. Kyle v. City of New Orleans, 353 So.2d at 972. La. C.Cr. P. art. 220 provides, “a person shall submit peaceable to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.” The court must evaluate the officer’s actions against those of ordinary, prudent and reasonable men placed in the *759 same position as the officers and with the same knowledge. The degree of force employed is a factual issue and the trial court’s finding on such issue is entitled to great weight. Kyle v. City of New Orleans, 353 So.2d at 972-73.
In determining whether the force used by a police officer was unreasonable under the circumstances, factors to be considered are: (1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the ar-restee’s escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers as compared to the arrestee, and (7) the exigency of the moment. Harris v. Carter, 33,951 (La.App. 2 Cir. 10/4/00), 768 So.2d 827 quoting Kyle v. City of New Orleans, 353 So.2d 969 (La.1977).
After a careful review of the record, we find that the NOPD and JPSO did not act reasonably under the circumstances. First, the court must look at the known | n character of the arrestee. In the present case, the officers inquired into the whereabouts of the two subjects and thought they would be able to locate them at 1312 Frenchmen Street. Officer Robinson testified that he knew Mr. Bates from previous dealings. Therefore, he was familiar with his propensity for dangerous behavior and his character. Furthermore, the subjects were wanted for the attempted murder of a police officer, which is a dangerous offense. Therefore, it was reasonable for the officers to believe that the subjects might be armed and dangerous.
The second Kyle factor is the risks and dangers faced by the officers. Once the officers entered the Ross home and were informed that the subjects were not present, the fear of imminent danger decreased. We do accept the testimony of the NOPD that there are occasions when residents he about the presence of wanted individuals. Therefore, it was reasonable for the officers to have their guns out and ready when checking such areas as a closet. However, it was not reasonable for the officers to point their guns in the face of both the adults and children in the home. Additionally, it was not reasonable for Officer Wiggington to demand Ms. Bernard, an obviously, physically-challenged woman, get up from her bed-ridden position. Likewise, the risks and dangers were minimal when the NOPD entered the room where the children were playing cards. There was no need to abruptly disturb the card game by kicking the cards out of the hands of Sandra Davis nor was it reasonable to have the kids exit the home in a single file line past their grandfather who was pinned up against the wall. In brief, the risks and dangers faced by the officers once they entered the home were not commensurate to the amount of force employed in the search of the Ross home.
|12Next, the nature of the offense was serious. The subjects were wanted for attempted murder of a police officer. The offense involves the use of a dangerous weapon. Therefore, it is reasonable to conclude that the subjects may be armed and dangerous. However, as stated above, there was no indication that the Ross family was attempting to harbor a wanted subject. Likewise there was no indication of any weapons. Whatever initial apprehensions the officers felt were diminished once they entered the home.
The next Kyle factor is the chance of escape if particular means are not employed. The officers thought the likelihood of escape wás high because there were multiple entrances to the Ross home and there was a fence surrounded the back entrance. Since the chance of a possible escape was high, it was reasonable and *760 practical for the officers to position themselves at each entrance of the home. Moreover, La.C.Cr.P. art. 224 reads in pertinent part:
In order to make an arrest, a peace officer who has announced his authority and purpose, may break open an outer or inner door or window of any vehicle .... where the person to be arrested is or is reasonably believed to be, if he is refused or otherwise obstructed from admittance.
It was not reasonable for the officers to enter the home without announcing their authority and presence. The trial court accepted the testimony that the officers broke the front and back door in order to gain entrance into the home. We too accept that testimony and find that the officers did not announce their authority and presence, which is a clear violation of La. C.Cr.P art. 224.
The next factor is the existence of alternative methods. In Mathieu v. Imperial Toy Corporation, 94-0952 p. 7 (La.11/30/94), 646 So.2d 318, the court said the “existence of other available alternative methods does not, in and of itself, | ^render the method chosen unreasonable.” In the instant case, the chosen method was unreasonable so it is not necessary to discuss possible alternative methods.
The sixth factor is the physical, size, strength and weaponry of the officers as compared to the subject. It is fair to say that the officers were far more equipped than the residents were. However, the record does not reveal the size of the subjects. Nonetheless, the officers were not reasonably in the search of the home.
The final factor is the exigency of the moment. The officers in the present case believed that the subjects were possibly armed and dangerous. They attempted to make the arrest in a residential area and feared the subjects may have tried to flee the area. Given these facts, it was reasonable to surround the Ross home, however, the officers actions in forcing their way into the home and the actions resulting from the search were unreasonable.
After examining the Kyle factors and looking at the totality of the circumstances, we find that the NOPD and JPSO did not act reasonably in attempting to make an arrest at 1312 Frenchmen Street.
Furthermore, as part of this assignment of error the NOPD also argues that the trial court erred in sustaining a hearsay objection. The officers were attempting to introduce into evidence witness statements from the individuals who directed them to 1312 Frenchmen Street. The officers did not produce the witnesses at trial and argue that La.Code of Evidence Article 803 applies as a hearsay exception. The NOPD argues that the hearsay objection is defeated by La. C.E. art. 803(3):
(3) Then existing mental, emotional, or physical condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant’s then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact 114remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s testament.
The NOPD argues that the evidence is not hearsay because it shows why they went to a different address from the one that was listed on the arrest warrant. We disagree. The trial court was correct is not allowing the hearsay evidence. La. C.O.E. Art. 801(C) defines hearsay as “a *761 statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” Hearsay is treated as unreliable because it is based on statements by individuals who are not before the court, have not been sworn and are not available for cross examination. State v. Tate, 25,765 (La.App. 2 Cir. 2/23/94), 632 So.2d 1213.
The NOPD’s reliance on this hearsay exception is misguided. The police officer’s witnesses do not fall within the hearsay exception. Their testimony was simply to show the state of mind of the officers and to prove the “truth of the matter asserted.” The witnesses should have been brought into court to supply the court with the information given to the officers on February 15, 1992. Consequently, the trial court’s ruling on the hearsay objection was correct. This part of the assignment lacks merit.
Assignment of Error NO. 3
NOPD: Defendant, The City Of New Orleans, Is Not Liable For Physical Injury, If any, Caused To Arthur Ross.
A trier of fact’s findings as to percentages of fault is factual and must be upheld on appeal unless there is manifest error. However, where manifest error exists, we are compelled to adjust those percentages. Allen v. Rawlins, 95-1592 (La.App. 4 Cir 2/15/96), 669 So.2d 1282.
|15The NOPD argues that they are not responsible for the injuries to Arthur Ross. We agree and find that the trial court erred in holding the NOPD responsible for Mr. Ross’ injuries. The testimony revealed that it was a JPSO officer who caused injury to Mr. Ross. Furthermore, Mr. Ross identified the officer as a JPSO. He testified that he was familiar with the JPSO uniform because he worked in Jefferson Parish. Therefore, that part of the judgment is reversed and the JPSO is responsible for the $10,000 allotted to Mr. Ross.
Assignment of Error NO. 4
NOPD: The Trial Court Abused Its Discretion In The Award of Damages To Plaintiffs.
With regard to the award of damages, there must be a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or low in proportion to the injury that it “shocks the conscience.” Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir. 1991). Additionally, in deciding whether a trial court award was excessive, reviewing courts must first consider the individual circumstances of the subject case to determine whether the trial court abused its much discretion in setting the award. Only after determining that the award in the subject case was improper may the reviewing court consider awards in similar cases. Brodtmann v. Duke, 96-0257 p. 21 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 459-460.
In the present case, the trial court found and the trial testimony established that the plaintiffs were subjected to humiliation and suffered some physical injury. The trial court was present to observe the demeanor and credibility of the witness and awarded damages accordingly. In evaluating the credibility of witnesses, Barrociere v. Batiste, 99-1800 p. 4 (La.App. 4 Cir. 2/2/00), 752 So.2d 324 found:
| ^Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exits in the testimony. The reasonable behind this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live *762 witnesses, as compared to a cold record, but also upon the proper allocation of trial and appellate functions. However, where documents or objective evidence so contradict the witness’ story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’ story, the court of appeal may find manifest or clear wrongness even in a finding purportedly based upon a credibility determination. Notwithstanding, where there are two permissible views of evidence, the factfinder’s choice between them cannot be manifestly or clearly wrong.
The testimony from the RosS family and the record fully demonstrates the humiliation and pain suffered by the family as a result of the behavior of the NOPD and the JPSO. Both departments acted unreasonably in entering and searching the home and the awards are commensurate to the emotional and physical injuries sustained. Hence, we find that those awards were not excessive and so low as to “shock the conscious” of this Court.
DECREE
For the reasons stated, we find that the NOPD and the JPSO did not act reasonably in their search of the Ross home. The trial court’s damage awards were not excessive and that part of the judgment is affirmed. However, the trial court did err in finding the NOPD solely responsible. The JPSO is responsible for the injuries sustained by Arthur Ross. Therefore, that portion of the judgment is reversed and the JPSO is cast in judgment in the amount of $10,000 for damages sustained by Mr. Ross.
AFFIRMED IN PART; REVERSED IN PART.