STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

03-1038

CORNELIA E. YOUNG, ET AL.

VERSUS

KEVIN FITZPATRICK, ET AL.

**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 52,484
HONORABLE JOHN C. FORD, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

AFFIRMED.

F. Steve Landreneau
Post Office Box 880
DeRidder, LA   70634
(337) 463-8692
COUNSEL FOR DEFENDANTS/APPELLEES:
     Sandman Motel
     Paul Vinson

Asa Allen Skinner
Skinner, Kees & Broyles
Post Office Box 1307
Leesville, LA   71496
(337) 239-2008
COUNSEL FOR DEFENDANTS/APPELLEES:
     Sandman Motel
     Paul Vinson

**Chris Smith, III**
**The Smith Law Firm, L.L.P.**
**Post Office Box Drawer 1528**
**Leesville, LA   71496**
**(337) 238-1531**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Cornelia E. Young**
    **Daniel Young**

**Jack L. Simms, Jr.**
**Post Office Box 1554**
**Leesville, LA   71496-1554**
**(337) 238-9393**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Cornelia E. Young**
    **Daniel Young**

**Daniel James Stanford**
**Post Office Drawer 751**
**Eunice, LA 70535**
**(337) 546-6622**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Kevin Fitzpatrick**

AMY, Judge.

The plaintiff accompanied the defendant to a motel room, where he severely beat and stabbed her. The defendant was eventually convicted of armed robbery and attempted murder in connection with the incident. In the interim, the plaintiff brought the instant civil suit against the defendant and against the motel at which the attack occurred. A bench trial was held in the matter, wherein the trial judge assigned all liability for Ms. Young's injuries to the defendant-perpetrator. The trial judge further determined, *inter alia*, that the defendant motel was not liable to the plaintiff because this particular attack was not foreseeable; the motel's night clerk had not acted negligently in failing to prevent the attack; and that the motel did not have a duty to the plaintiff to adopt a security plan and to further train the clerk who was on duty during the attack. From this judgment, the plaintiff appeals. We affirm.

**Factual and Procedural Background**

The instant appeal arises from a civil proceeding that was filed due to certain criminal acts that took place in Leesville, Louisiana, during the early morning hours of July 2, 1992. The record indicates that at the time of the criminal acts forming the basis for the present suit, Cornelia Young, the plaintiff herein, had been married just a short time to a soldier based out of Fort Polk. Ms. Young testified at trial that on the evening of July 1, 1992, she had arranged to meet some of her friends at an area nightclub. She recalled that upon arriving at the club, she was told that Kevin Fitzpatrick, defendant herein, was looking for her. Ms. Young explained that she and Mr. Fitzpatrick, a soldier stationed at Fort Polk, had met through mutual friends and had known each other approximately six months at the time. According to Ms. Young, she and Mr. Fitzpatrick talked and had a few cocktails when she indicated that a zipper had broken in her dress, and she wanted to go home. She and Mr. Fitzpatrick

left the club together with the understanding that on her way home, she would drop him off at the Sandman Motel, where he had rented a room for the night.

Ms. Young stated that after arriving at the motel, she and Mr. Fitzpatrick remained in her car in the parking lot because Mr. Fitzpatrick "had just gotten out of some trouble with the military and . . . was upset about it and wanted to talk." After a while, the two went to Mr. Fitzpatrick's room. According to her testimony at trial, Ms. Young was still wearing the dress with the broken zipper, so she went into the bathroom to change into a t-shirt that Mr. Fitzpatrick had given her. She stated that upon exiting the bathroom, Mr. Fitzpatrick began to act strangely, and she began to feel uncomfortable. The record indicates that Ms. Young, still wearing Mr. Fitzpatrick's t-shirt, stated that she was going to go home and walked towards a table to gather her things when she was pushed from behind. Ms. Young recalled that she turned around, saw Mr. Fitzpatrick coming at her, realized she was being attacked, and attempted to defend herself. Mr. Fitzpatrick then proceeded to stab her four times in the back, stab her in the hand, break her nose and her cheekbone, rupture both disks in her jaw, and fracture part of her skull. Finally, he strangled her with a telephone cord. Ms. Young passed out, and Mr. Fitzpatrick left[1]. Upon regaining consciousness, Ms. Young went to the motel's front desk and asked the clerk for help. The clerk called 911, and Ms. Young was taken to the emergency room at Byrd Memorial Hospital, where the record indicates that she was treated for facial injuries and stab wounds in her back, and surgery was performed on the hand that sustained the stab wound. She remained in the hospital for a week, and, shortly after her discharge, her husband requested a compassionate reassignment.

---

[1]Ms. Young testified at trial that she believed that Mr. Fitzpatrick had attacked her so that he might take her car, her jewelry, and her checkbook. The record indicates that after the attack, Mr. Fitzpatrick took Ms. Young's car and fled to Wisconsin, where he was located and arrested by authorities.

Ms. Young brought the instant cause of action against Kevin Fitzpatrick and Paul Vinson d/b/a Sandman Motel, seeking damages. Daniel Young, to whom Ms. Young was married when the cause of action was initiated, sued for loss of consortium. A bench trial was held in the matter on April 19, 2001. On April 17, 2003, the trial judge issued a judgment in the matter, in which he determined that Kevin Fitzpatrick was solely liable for Ms. Young's injuries and assessed $250,000 in damages against him. Written reasons for judgment and notice of signing were issued on November 12, 2002. Supplemental written reasons, in which court costs were assessed to Kevin Fitzpatrick, were issued on March 14, 2003, and notice of signing of the supplemental reasons for judgment was mailed on March 18, 2003. Ms. Young filed the instant devolutive appeal on May 21, 2003.

**Discussion**

Ms. Young contests the trial court's determination that the Sandman Motel was not liable for her injuries. More specifically, Ms. Young asserts that the trial judge erred in reaching this conclusion as follows:

> 1. The trial judge erred in determining that this incident was not foreseeable due to insufficient evidence of prior criminal activity on the hotel premises.
>
> 2. The trial judge erred in determining that the innkeeper did not owe a duty to Ms. Young to implement a security plan and was not required to further train the night desk clerk.
>
> 3. The trial judge erred in determining that the night clerk did not act negligently.
>
> 4. The trial judge erred in accepting the defendants' expert witness.
>
> 5. The trial judge did not award Ms. Young adequate damages.

We review the trial court's conclusions in this tort cause of action pursuant to the manifest-error standard. *Lasyone v. Kansas City S.R.R.*, 00-2628 (La. 4/3/01), 786 So.2d 682.

3

*Trial Judge's Acceptance of the Sandman Motel's Expert Witness*

We first address Ms. Young's claim that the trial court erred in accepting the defendant's expert witness. In support of her claims that the Sandman Motel was liable in part for her injuries, Ms. Young offered Dr. William E. Thornton, Jr., a professor of criminology at Loyola University New Orleans, as an expert in the field of hotel-motel security. The record indicates that Dr. Thornton holds a Ph.D. in sociology, with emphases in criminology and research methods of social psychology, and he teaches courses in such areas as crime prevention, security management, criminology, and forensic criminology. At trial, Dr. Thornton stated that he is a member of many criminological and security associations, particularly the American Industrial Security Association's hospitality committee, which addresses hotel security. He is also a member of a consulting firm that gives security assessments and performs crime and foreseeability analyses. Dr. Thornton has published several articles addressing security and has included materials on hotel-motel security in textbooks that he has written.

In turn, the Sandman Motel offered Mr. Billy Hammons as its expert witness regarding hotel safety. Mr. Hammons owned and operated the Redwood Motel in Leesville from 1982 to mid-1998 and was previously employed by the Department of Justice. Mr. Hammons stated that although he never received any formal training in hotel security, he applied anti-terrorist intrusion techniques learned during his employment with the Department of Justice to the operation of his motel.

The record indicates that after traversal of Mr. Hammons by Ms. Young's attorney, the trial judge stated as follows:

> I'll accept Mr. Hammons as an expert. He certainly doesn't have the qualifications [of Dr. Thornton] but I believe he's an educated man, college degree. He has experience in the security measures and surveillance and so forth and his – more importantly his personal

4

experience of operating a motel in this area for approximately eight or nine years. . . .

Pursuant to the supreme court's opinion in *Lasyone*, after the qualification of expert witnesses, the trial judge is free to evaluate each expert witness's credibility and to weigh their respective testimony accordingly in reaching a decision in the matter:

> [I]t is well accepted that the trier of fact is charged with the determination of what credibility it assigns to expert witnesses and then to decide which expert among those testifying that it finds more credible. *Mistich v. Volkswagen of Germany, Inc.*, 95-0939 (La.1/29/96), 666 So.2d 1073.

*Lasyone*, 786 So.2d at 692. We find no manifest error in the trial judge's determination that Mr. Hammons qualified as an expert witness.

*Duty-Risk Analysis*

The remaining assignments of error require an evaluation of the trial court's determinations pursuant to the duty-risk analysis traditionally employed in Louisiana tort cases. In its opinion in *Perkins v. Entergy Corp.*, 00-1372 (La. 3/23/01), 782 So.2d 606, the Louisiana Supreme Court provided the following overview of the various considerations involved in assessing whether a party is liable pursuant to the duty-risk analysis:

> The determination of liability under the duty/risk analysis usually requires proof of five separate elements: (1) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). *Boykin v. Louisiana Transit Co., Inc.*, 96-1932, pp. 8-9 (La.3/4/98), 707 So.2d 1225, 1230 (citing David W. Robertson et al., *Cases and Materials on Torts* 83-84 (1989); *Fowler v. Roberts*, 556 So.2d 1 (La.1989) (on original hearing)). *See also Roberts v. Benoit*, 605 So.2d 1032, 1051 (La.1991). If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable.

*See Mathieu v. Imperial Toy Corporation*, 94-0952, p. 11 (La.11/30/94), 646 So.2d 318, 326. . . .

Generally, the initial determination in the duty/risk analysis is cause-in-fact. *Boykin*, 707 So.2d at 1230. Cause-in-fact usually is a "but for" inquiry, which tests whether the accident would or would not have happened but for the defendant's substandard conduct. *Id*. Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. *Id*. at n. 10; *Jones v. Hawkins*, 98-1259, 98-1288, p. 7 (La.3/19/99), 731 So.2d 216, 220; *Rick v. State, Dept. of Transp. and Development*, 93 1776, 93-1784, p. 8 (La.1/14/94), 630 So.2d 1271, 1275; *Dixie Drive It Yourself System v. American Beverage Co.*, 242 La. 471, 137 So.2d 298 (1962). To satisfy the substantial factor test, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was a substantial factor bringing about the complained of harm. *Dabog v. Deris*, 625 So.2d 492, 493 (La.1993).
. . . .

However, while deference must be given to the factfinder's determinations, this court clarified in *Ambrose* [*v. New Orleans Police Department Ambulance Service*, 93-3099 (La.7/5/94), 639 So.2d 216] that our purpose in *Stobart* [*v. State, Through DOTD*, 617 So.2d 880, 882 (La.1993)]was not "to mandate that the trial court's factual determinations cannot ever, or harldy [sic] ever, be upset." *Ambrose*, 639 So.2d at 221. Recognizing that great deference should be accorded to the factfinder, the court of appeal and this court have a constitutional duty to review facts. *Id*. To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. *Id*.

*Perkins*, 782 So.2d at 611-13 (footnotes omitted).

In his written reasons for judgment, the trial judge explained the duty-risk analysis as it applies to the instant matter as follows:

[A]n innkeeper owes a duty of ordinary care to its guests, invitees, and patrons. This duty is defined as that standard of care exercised by an ordinary innkeeper under the circumstances.

The duty-risk analysis requires that the court first find that the defendant's conduct was a cause-in-fact of the harm suffered. That is, if defendant's conduct probably caused plaintiff's injury then defendant's conduct was a cause-in-fact of plaintiff's injury. If, on the other hand, plaintiff probably would have suffered the injury even in the absence of defendant's conduct, then defendant's conduct is not a cause-in-fact of the injury.

*Foreseeability*

The trial judge then engaged in an application of the duty-risk analysis to the facts of the instant matter in reaching a decision as to whether the Sandman Motel had breached its duty to Ms. Young. In his written reasons for judgment, the trial judge addressed Ms. Young's claim that the Sandman Motel also had a duty to implement a security plan and to further train the night desk clerk. The trial judge began his analysis by reproducing the following portions of the supreme court's decision in *Posecai v. Wal-Mart Stores, Inc.*, 99-1222 (La. 11/30/99), 752 So.2d 762, which read:

> We agree that a balancing test is the best method for determining when business owners owe a duty to provide security for their patrons. The economic and social impact of requiring businesses to provide security on their premises is an important factor. Security is a significant monetary expense for any business and further increases the cost of doing business in high crime areas that are already economically depressed. Moreover, businesses are generally not responsible for the endemic crime that plagues our communities, a societal problem that even our law enforcement and other government agencies have been unable to solve. At the same time, business owners are in the best position to appreciate the crime risks that are posed on their premises and to take reasonable precautions to counteract those risks.
>
> With the foregoing considerations in mind, we adopt the following balancing test to be used in deciding whether a business owes a duty of care to protect its customers from the criminal acts of third parties. The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as using surveillance cameras, installing improved lighting or fencing, or trimming shrubbery. The plaintiff has the burden of establishing the duty the defendant owed under the circumstances.
>
> The foreseeability and gravity of the harm are to be determined by the facts and circumstances of the case. The most important factor to be considered is the existence, frequency and similarity of prior incidents of crime on the premises, but the location, nature and condition of the property should also be taken into account. It is highly unlikely that a crime risk will be sufficiently foreseeable for the imposition of a duty to provide security guards if there have not been previous instances of crime on the business' premises.

*Posecai*, 752 So.2d at 768.

After considering the evidence presented at trial, the trial judge concluded that:

> [c]onsidering the circumstances of this case where the victim was an invitee of a registered guest and was attacked by the guest in the rented room there were not sufficient prior criminal acts on the premises so as to render it foreseeable by the innkeeper that such harm to plaintiff was likely to occur.

Ms. Young challenges the trial judge's conclusion on appeal, contending that it was error for the trial judge to determine that evidence of criminal activity on motel premises was insufficient for the Sandman's owners to have foreseen the attack. In essence, Ms. Young argues that the trial judge erred in finding, pursuant to the second prong of the duty-risk analysis as set forth by the supreme court in *Perkins*, 782 So.2d 606, that the Sandman's conduct did, in fact, conform to the appropriate standard—*viz.*, that the Sandman had not committed a breach of the applicable standard of conduct by doing business without a night watchman on duty.

In support of her assertion that the Sandman Motel could have foreseen the attack, Ms. Young underscores the testimony of Dr. William Thornton, Jr., whom she presented as an expert in the field of hotel security at trial. Ms. Young claims that Dr. Thornton's testimony indicates that the frequency of calls to the police from the motel and the location of the Sandman along a strip containing roughly twenty bars should have put its ownership on notice that it faced a greater risk of attacks on its guests or criminal activity by bar patrons on the motel premises. Ms. Young contends that Dr. Thornton's testimony at trial substantiates her claim that the Sandman's ownership could have foreseen the scenario in which Mr. Fitzpatrick attacked her, thereby breaching its duty to her, and that the trial judge erred in determining to the contrary.

According to the record of the proceedings below, Ms. Young offered medical records and the deposition of Carolyn Myers, the night clerk on duty at the time of the attack, into evidence. Ms. Young did not offer into evidence any police reports or other statistics regarding criminal activity at or around the Sandman Motel. Instead,

8

the foreseeability issue was developed via the opinion testimony of the respective parties' expert witnesses.

Dr. Thornton explained at trial that in conjunction with his work in this matter, he received photographs of the Sandman Motel and three nearby bars. He was also given copies of Carolyn Myers' depositions in the criminal and civil trials and the criminal-trial testimony given by Ms. Young. Furthermore, Dr. Thornton examined local newspaper files and was given information from the Vernon Parish Sheriff's Department, such as the incident report, a copy of the investigative report, and information regarding calls from the district encompassing the Sandman and the surrounding bars for the years 1987-1989 and 1993-1995. Dr. Thornton noted that he also spent a day at the Sandman and the surrounding area.

Dr. Thornton testified at trial, however, that the records of the Vernon Parish Sheriff's Office detailing calls from the Sandman Motel did not involve "real serious offenses." Dr. Thornton indicated that among the records are "in excess of 25 disturbances of the peace, there was one armed robbery and apparently there was [sic] some unreported crimes too." Moreover, on cross-examination, Dr. Thornton stated that no one could have foreseen this particular incident, in which Ms. Young was attacked by Mr. Fitzpatrick.

The Sandman's expert witness, Mr. Billy Hammons, opined at trial that the Sandman's ownership could not have foreseen that an attack such as that against Ms. Young would have occurred on the motel premises.

> Q [by Mr. Landreneau, attorney for the Sandman Motel]. Do you feel that there's anything that the Sandman Motel, either through the owners or through Mrs. Myers, could have done to have prevented this initial attack of Mrs. Young in this case?
> A [by Mr. Hammons]. I could – I am – there was no foreseeability that I know of. There's none of us that are seers of the future and there was no way in the world that a desk clerk checking this gentlemen [sic] in on July the 1st or any other patron on July the 1st would [know that he would] undertake such a – such a violent crime.

9

We find no manifest error in the trial judge's determination that the evidence presented at trial was insufficient to indicate that the Sandman Motel could have foreseen an attack such as that against Ms. Young. This assignment lacks merit.

*Failure to Implement a Security Plan and Negligent Actions of the Night Clerk*

Ms. Young next argues in interrelated assignments of error that the trial judge incorrectly determined that the Sandman Motel was not negligent in failing to adopt a security plan and that Carolyn Myers, the night clerk on duty at the time of the attack, had not acted negligently.

At trial, Ms. Young introduced into evidence the deposition of Ms. Myers, the night clerk on duty at the Sandman Motel at the time of the attack. In this deposition, Ms. Myers recalled that an alarm went off at the front desk at around one o'clock on the morning of July 2, 1992, signaling that the telephone in Mr. Fitzpatrick's room had been disconnected from the wall.[2] Ms. Myers equipped herself with a large stick and a can of mace, walked to Mr. Fitzpatrick's room, and knocked on the door. She attempted to open the door using her master key, but the door slammed shut. According to Ms. Myers' deposition, she asked through the door if something was wrong with the telephone, and a male voice answered that his friend had knocked it off the desk. She informed the occupant of the room that in order to stop the alarm, the phone needed to be plugged back into the wall. Ms. Myers then returned to the front desk. Approximately thirty minutes later, the alarm went off again. Ms. Myers stated that she returned to Mr. Fitzpatrick's room, taking the stick and the mace with her. Upon arriving, she shouted through the door that she would call the police if the phone was not taken care of. A male voice responded that there was a problem with the phone but that Ms. Myers was not going to be allowed entrance to the room.

---

[2]At trial, Dr. Thornton indicated that such alarms were generally used in the past in an effort to keep telephones from being stolen from motel rooms.

When she returned to the front desk, the alarm was still sounding. Ms. Myers' deposition indicates that she then left the office and walked to the corner of the motel pool, from which Mr. Fitzpatrick's room was visible. Ms. Myers observed the room for five to ten minutes in an attempt to ascertain what was going on, but she did not see anything. Ms. Myers then returned to the office and disconnected the alarm's audio feature; however, the alarm's light still flashed. She did not call the police at this time. Ms. Myers next recalled that at around three or half-past three o'clock in the morning, a man claiming to be Mr. Fitzpatrick entered the office and asked her for an extra key to his room. Ms. Myers asked him for identification and gave him a key but did not ask about the phone. At approximately four thirty in the morning, Ms. Young came into the office, visibly battered, and told Ms. Myers what had happened. Ms. Myers then called for assistance.

At trial, Dr. Thornton, Ms. Young's expert witness, opined that the Sandman Motel did not have adequate security and that its owner had failed to exercise ordinary and reasonable care, as per industry guidelines, that would protect an invitee such as Ms. Young. Dr. Thornton observed that "[s]ecurity guards obviously can not prevent all things to all people but having a visible security guard – it's common knowledge that it can be a deterrent to certain types of activities that take place on premises." He further stated that the night desk clerk was not given adequate formal training and was forced to improvise, such as in investigating the telephone alarm herself. The clerk was instructed to call the police only when necessary and was advised of the owners' preference that she not call the police.

Dr. Thornton stated that a basic premise found in the hotel-motel industry guidelines is that security plans need to be implemented that detail procedures for all personnel and that establish plans of action for emergencies. Dr. Thornton noted that the guidelines also recommend sufficient training for staff. According to the

guidelines, Dr. Thornton noted, desk clerks such as Carolyn Myers are not supposed to be patrolling the hotel grounds. Dr. Thornton observed that the desk clerk was performing all duties of the motel and that this practice was not advisable. He explained that the American Association of Hotels and Motels circulates literature which contains guidelines for security, and according to the American Motel Hotel Association, the duties of front-desk employees are:

> check-ins, handling complaints in the office, quality service, credit guidelines, key control, handling emergencies. And emergencies basically are being able to refer to a security person on the premises, a late night security guard on duty or picking up the phone and calling 911 immediately when there's a question. Not going down with a big stick and a can of Mace trying to enter a room. Not investigating.

He indicated that the guidelines recommend that security personnel perform security tasks and that having one employee on duty late at night is not adequate staffing. Dr. Thornton further noted that the motel's location, among bars and nightclubs, means that the owners should have been monitoring crimes that occur in the surrounding area because bars often attract crime.

The Sandman Motel's expert witness, however, indicated in the following colloquy that in the Leesville area, it was commonplace for desk clerks to investigate occurrences on motel premises but did so with deference to guests' expectations of privacy:

> Q  [by Mr. Landreneau]. Is it common in motels of this area to have clerical staff make a preliminary inquiry into incidents?
> A  [by Mr. Hammons]. To my knowledge it is. All of the owners that I have spoken to in the past and the way that I formulated part of my plan was based on their experience [sic]. Some of them much longer experience than I had and that is that you make a basic inquiry as to what is actually transpiring without being intrusive, without upsetting your guests or if you're just investigating an incident such as this of a telephone malfunction or something like that, we are of the opinion that motel guests have a reasonable expectation of privacy. So therefore when you undertake to intrude on their privacy you must have just cause to do so so it's a tenuous situation. And the basic instructions are that you go to the location, that you announce yourself and you ask if there is a

problem that can be resolved either in the room or by doing something in the office to solve the issue.

Q. Based upon your review of the documents you saw and your testimony you've seen today, do you feel like a security guard should have been hired by the Sandman Motel to attempt to avoid the incident that was described in this case?

A. I've looked at that issue at my own motel in the past and could never really reach the threshold of saying that there was enough what I would call aggravated crime such as fist fights, verbal alterations [sic] that were totally out of hand or scuffles that would require a person to intervene that would be a professional. And even if there were an altercation occurring the instructions were that you don't intervene, you call the police, you let the police take care of the issue. That's why they are policemen and that's why they're employed.

Q. And these types of incidents such as – you know, loud noises, parking lot disturbances, things like that, are most of these incidents resolved without the necessary intervention of the local police force?

A. As a general rule whenever we – whenever we have an incident that requires a police activity such as a fender bender in your parking lot or something like that, as a courtesy we do call the police and have them come and make an inquiry. If it's disturbance of doing one of those yea-yea acts, well then, you just ask them to quietened [sic] down. If they don't quietened down that [sic] we'll take corrective action. Corrective action being is [sic] that we'll ask them to leave and vacate their room. If they don't choose to do so and continue the activity, then we'll call law enforcement to take appropriate action. . . .

Moreover, on the subject of Ms. Myers' actions with respect to the telephone alarm, Mr. Hammons opined that in checking on the alarm, Ms. Myers would not have had any concrete reason to call the police. Mr. Hammons stated that:

Having had experience as personally [sic] with issues of this nature, I don't think that this particular inquiry rises to the level that would have caused a reasonable person, especially under instructions and knowing the privacy is a protected issue at motels, would cause it to rise to that level. I think – had the clerk heard a cry or heard an unusual sound, heard a – saw something, smelled something, anything to give rise to something other than just meeting this issue of having a phone disconnected, I don't see where she acted improperly at all.

After considering the evidence, the trial judge found that "[t]he night clerk received no training whatsoever and she was not instructed to call the police unless it was absolutely necessary." The trial judge likewise determined that the night

13

clerk's conduct was reasonable under the circumstances and that she did not hear or see anything that would give rise to a reasonable inference that Ms. Young was being attacked. The trial judge further noted that even if the Sandman had implemented a security plan, it is nevertheless likely that Ms. Young would have been attacked. In his written reasons for judgment, the trial judge noted the evidence presented at trial that influenced his conclusion that the night clerk acted reasonably:

> Should the night clerk have known that plaintiff was in danger in room 145? The court considers the following facts: (1) she thought the room was occupied by two men; (2) the alarm had gone off one time and had been fixed by an occupant of the room; (3) the second time, the occupant refused her assistance and said he would take care of it; (4) in the past, alarms had to be manually turned off because of defective wiring or plug-ins and she testified that she thought that is what happened this time; (5) she also suspected the guests might be picking at her. Considering what the evidence established she knew at that time, her conduct leads the court to conclude that had she seen or heard anything that would have led her to believe that a person in the room was in danger, it is more probable than not that she would have called the police.

Based upon our examination of the record, we find that the trial judge did not manifestly err in his determination that the night clerk had not acted negligently and that the Sandman Motel had not breached its duty of ordinary care to Ms. Young. This assignment lacks merit.

*Damages*

Finally, we address Ms. Young's contention that the trial judge's award of $250,000 in damages against Mr. Fitzpatrick was not adequate. The standard that an appellate court is to employ in reviewing a lower court's award of damages is described in the fourth circuit's decision in *Ross v. City of New Orleans*, 00-1879 p. 15 (La.App. 4 Cir. 11/21/01), 808 So.2d 751, 761 as follows:

> With regard to the award of damages, there must be a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or low in proportion to the injury that it "shocks the conscience." *Moore v. Healthcare Elmwood, Inc.*, 582 So.2d 871 (La.App. 5 Cir.1991). Additionally, in deciding whether a trial court award was excessive, reviewing courts must first consider the individual circumstances of the subject case to determine whether the trial court abused its much discretion in setting the award. Only after determining that the award in the subject case was improper may the reviewing court consider awards in similar cases. *Brodtmann v. Duke*, 96-0257 p. 21 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 459-460.

Moreover, in *Wainwright v. Fontenot*, 00-0492, p. 6 (La. 10/17/00), 774 So.2d 70, 74, the supreme court stated that:

> [T]he assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993).

Shortly after she was released from Byrd Memorial Hospital in July 1992, Ms. Young and her husband moved to Fort Stewart, Georgia, where Ms. Young received further treatment for the injuries she sustained during the attack. The record indicates that Ms. Young underwent various surgeries to remove the ruptured disks in her jaw, repair her nose, repair her cheekbone, remove the pins from her hand, and to have stitches removed. Ms. Young testified that as of the date of trial, and despite these procedures, she still experienced considerable pain in her jaw. In addition, for six years after the events of July 2, 1992, Ms. Young received counseling from a

psychologist to treat her anxiety attacks and her fear of being alone. Ms. Young further alleges that as a result of the psychological impact of the attack upon her, the Youngs' marriage began to deteriorate, culminating in divorce in 1996.

In the case *sub judice*, we conclude that the trial judge did not abuse his discretion in awarding Ms. Young $250,000 in damages stemming from the attack at the Sandman Motel. The trial judge was in the best position to evaluate all the evidence presented in reaching a determination as to an appropriate amount of quantum, and the award at issue is neither so high nor so low as to "shock the conscience." This assignment is without merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assigned to the plaintiff-appellant, Cornelia Young.

**AFFIRMED.**